# GRAVEL v. UNITED STATES

No. 71–1017.  Argued April 19–20, 1972—Decided June 29, 1972*

---

*Together with No. 71–1026, *United States* v. *Gravel,* also on certiorari to the same court.

WHITE, J., wrote the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed an opinion dissenting in part, *post*, p. 629. DOUGLAS, J., filed a dissenting opinion, *post*, p. 633. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post*, p. 648.

*Robert J. Reinstein* and *Charles L. Fishman* argued the cause for petitioner in No. 71–1017 and for respondent in No. 71–1026. With them on the briefs were *Harvey A. Silverglate* and *Alan M. Dershowitz.*

*Solicitor General Griswold* argued the cause for the United States in both cases. With him on the briefs were *Assistant Attorney General Mardian, Jerome M. Feit, Allan A. Tuttle,* and *Robert L. Keuch.*

*Sam J. Ervin, Jr.,* and *William B. Saxbe* argued the cause for the Senate of the United States as *amicus curiae.* With them on the brief were *James O. Eastland, John O. Pastore, Herman E. Talmadge, Norris Cotton, Peter H. Dominick, Charles McC. Mathias, Jr., Philip B. Kurland,* and *Edward I. Rothschild.*

Briefs of *amici curiae* were filed by *Melvin L. Wulf* and *Sanford Jay Rosen* for the American Civil Liberties

Union; by *Frank B. Frederick* and *Henry Paul Monaghan* for the Unitarian Universalist Association; and by *Morton Stavis* and *Doris Peterson* for Leonard S. Rodberg.

Opinion of the Court by MR. JUSTICE WHITE, announced by MR. JUSTICE BLACKMUN.

These cases arise out of the investigation by a federal grand jury into possible criminal conduct with respect to the release and publication of a classified Defense Department study entitled History of the United States Decision-Making Process on Viet Nam Policy. This document, popularly known as the Pentagon Papers, bore a Defense security classification of Top Secret-Sensitive. The crimes being investigated included the retention of public property or records with intent to convert (18 U. S. C. § 641), the gathering and transmitting of national defense information (18 U. S. C. § 793), the concealment or removal of public records or documents (18 U. S. C. § 2071), and conspiracy to commit such offenses and to defraud the United States (18 U. S. C. § 371).

Among the witnesses subpoenaed were Leonard S. Rodberg, an assistant to Senator Mike Gravel of Alaska and a resident fellow at the Institute of Policy Studies, and Howard Webber, Director of M. I. T. Press. Senator Gravel, as intervenor,[1] filed motions to quash the

_____

[1] The District Court permitted Senator Gravel to intervene in the proceeding on Dr. Rodberg's motion to quash the subpoena ordering his appearance before the grand jury and accepted motions from Gravel to quash the subpoena and to specify the exact nature of the questions to be asked Rodberg. The Government contested Gravel's standing to appeal the trial court's disposition of these motions on the ground that, had the subpoena been directed to the Senator, he could not have appealed from a denial of a motion to quash without first refusing to comply with the subpoena and being held in contempt. *United States* v. *Ryan*, 402 U. S. 530 (1971); *Cobbledick* v. *United States*, 309 U. S. 323 (1940). The Court of

subpoenas and to require the Government to specify the particular questions to be addressed to Rodberg.[2] He asserted that requiring these witnesses to appear and testify would violate his privilege under the Speech or Debate Clause of the United States Constitution, Art. I, § 6, cl. 1.

It appeared that on the night of June 29, 1971, Senator Gravel, as Chairman of the Subcommittee on Buildings and Grounds of the Senate Public Works Committee, convened a meeting of the subcommittee and there read extensively from a copy of the Pentagon Papers. He then placed the entire 47 volumes of the study in the public record. Rodberg had been added to the Senator's staff earlier in the day and assisted Gravel in preparing for and conducting the hearing.[3] Some weeks later there were press reports that Gravel had arranged for the papers to be published by Beacon

---

Appeals, *United States* v. *Doe*, 455 F. 2d 753, 756–757 (CA1 1972), held that because the subpoena was directed to third parties, who could not be counted on to risk contempt to protect intervenor's rights, Gravel might be "powerless to avert the mischief of the order" if not permitted to appeal, citing *Perlman* v. *United States*, 247 U. S. 7, 13 (1918). The United States does not here challenge the propriety of the appeal.

[2] Dr. Rodberg, who filed his own motion to quash the subpoena directing his appearance and testimony, appeared as *amicus curiae* both in the Court of Appeals and this Court. Technically, Rodberg states, he is a party to No. 71–1026, insofar as the Government appeals from the protective order entered by the District Court. However, since Gravel intervened, Rodberg does not press the point. Brief of Leonard S. Rodberg as *Amicus Curiae* 2 n. 2.

[3] The District Court found "that 'as personal assistant to movant [Gravel], Dr. Rodberg assisted movant in preparing for disclosure and subsequently disclosing to movant's colleagues and constituents, at a hearing of the Senate Subcommittee on Public Buildings and Grounds, the contents of the so-called "Pentagon Papers," which were critical of the Executive's conduct in the field of foreign relations.' " *United States* v. *Doe*, 332 F. Supp. 930, 932 (Mass. 1971).

Press[4] and that members of Gravel's staff had talked with Webber as editor of M. I. T. Press.[5]

The District Court overruled the motions to quash and to specify questions but entered an order proscribing certain categories of questions. *United States* v. *Doe,* 332 F. Supp. 930 (Mass. 1971). The Government's contention that for purposes of applying the Speech or Debate Clause the courts were free to inquire into the regularity of the subcommittee meeting was rejected.[6] Because the Clause protected all legislative

---

[4] Beacon Press is a division of the Unitarian Universalist Association, which appeared here as *amicus curiae* in support of the position taken by Senator Gravel.

[5] Gravel so alleged in his motion to intervene in the Webber matter and to quash the subpoena ordering Webber to appear and testify. App. 15–18.

[6] The Government maintained that Congress does not enjoy unlimited power to conduct business and that judicial review has often been exercised to curb extra-legislative incursions by legislative committees, citing *Watkins* v. *United States,* 354 U. S. 178 (1957); *McGrain* v. *Daugherty,* 273 U. S. 135 (1927); *Hentoff* v. *Ichord,* 318 F. Supp. 1175 (DC 1970), at least where such incursions are unrelated to a legitimate legislative purpose. It was alleged that Gravel had "convened a special, unauthorized, and untimely meeting of the Senate Subcommittee on Public Works (at midnight on June 29, 1971), for the purpose of reading the documents and thereafter placed all unread portions in the subcommittee record, with Dr. Rodberg soliciting publication following the meeting." App. 9. The District Court rejected the contention: "Senator Gravel has suggested that the availability of funds for the construction and improvement of public buildings and grounds has been affected by the necessary costs of the war in Vietnam and that therefore the development and conduct of the war is properly within the concern of his subcommittee. The court rejects the Government's argument without detailed consideration of the merits of the Senator's position, on the basis of the general rule restricting judicial inquiry into matters of legislative purpose and operations." *United States* v. *Doe,* 332 F. Supp., at 935. Cases such as *Watkins, supra,* were distinguished on the ground that they concerned the power of Congress under the Constitution: "It has not been suggested

acts, it was held to shield from inquiry anything the Senator did at the subcommittee meeting and "certain acts done in preparation therefor." *Id.*, at 935. The Senator's privilege also prohibited "inquiry into things done by Dr. Rodberg as the Senator's agent or assistant which would have been legislative acts, and therefore privileged, if performed by the Senator personally." *Id.*, at 937–938.[7] The trial court, however, held the private publication of the documents was not privileged by the Speech or Debate Clause. *Id.*, at 936.[8]

The Court of Appeals affirmed the denial of the motions to quash but modified the protective order to reflect its own views of the scope of the congressional privilege. *United States* v. *Doe*, 455 F. 2d 753 (CA1 1972). Agreeing that Senator and aide were one for

by the Government that the Subcommittee itself is unauthorized, nor that the war in Vietnam is an issue beyond the purview of congressional debate and action. Also, the individual rights at stake in these proceedings are not those of a witness before a congressional committee or of a subject of a committee's investigation, but only those of a congressman and member of his personal staff who claim 'intimidation by the executive.' " 332 F. Supp., at 936.

[7] The District Court thought that Rodberg could be questioned concerning his own conduct prior to joining the Senator's staff and concerning the activities of third parties with whom Rodberg and Gravel dealt. *Id.*, at 934.

[8] The protective order entered by the District Court provided as follows:

"(1) No witness before the grand jury currently investigating the release of the Pentagon Papers may be questioned about Senator Mike Gravel's conduct at a meeting of the Subcommittee on Public Buildings and Grounds on June 29, 1971 nor about things done by the Senator in preparation for and intimately related to said meeting.

"(2) Dr. Leonard S. Rodberg may not be questioned about his own actions on June 29, 1971 after having been engaged as a member of Senator Gravel's personal staff to the extent that they were taken at the Senator's direction either at a meeting of the Subcommittee on Public Buildings and Grounds or in preparation for and intimately related to said meeting." *Id.*, at 938.

the purposes of the Speech or Debate Clause and that the Clause foreclosed inquiry of both Senator and aide with respect to legislative acts, the Court of Appeals also viewed the privilege as barring direct inquiry of the Senator or his aide, but not of third parties, as to the sources of the Senator's information used in performing legislative duties.[9] Although it did not consider private publication by the Senator or Beacon Press to be protected by the Constitution, the Court of Appeals apparently held that neither Senator nor aide could be questioned about it because of a common-law privilege akin to the judicially created immunity of executive officers from liability for libel contained in a news release issued in the course of their normal duties. See *Barr* v. *Matteo,* 360 U. S. 564 (1959). This privilege, fashioned by the Court of Appeals, would not protect third parties from similar inquiries before the grand jury. As modified by the Court of Appeals, the protective order to be observed by prosecution and grand jury was:

"(1) No witness before the grand jury currently investigating the release of the Pentagon Papers may be questioned about Senator Mike Gravel's conduct at a meeting of the Subcommittee on Public Buildings and Grounds on June 29, 1971, nor, if the questions are directed to the motives or purposes behind the Senator's conduct at that meeting, about any communications with him or with

---

[9] The Court of Appeals thought third parties could be questioned as to their own conduct regarding the Pentagon Papers, "including their dealing with intervenor or his aides." *United States* v. *Doe,* 455 F. 2d, at 761. The court found no merit in the claim that such parties should be shielded from questioning under the Speech or Debate Clause concerning their own wrongful acts, even if such questioning may bring the Senator's conduct into question. *Id.,* at 758 n. 2.

his aides regarding the activities of the Senator or his aides during the period of their employment, in preparation for and related to said meeting.

"(2) Dr. Leonard S. Rodberg may not be questioned about his own actions in the broadest sense, including observations and communications, oral or written, by or to him or coming to his attention while being interviewed for, or after having been engaged as a member of Senator Gravel's personal staff to the extent that they were in the course of his employment."

The United States petitioned for certiorari challenging the ruling that aides and other persons may not be questioned with respect to legislative acts and that an aide to a Member of Congress has a common-law privilege not to testify before a grand jury with respect to private publication of materials introduced into a subcommittee record. Senator Gravel also petitioned for certiorari seeking reversal of the Court of Appeals insofar as it held private publication unprotected by the Speech or Debate Clause and asserting that the protective order of the Court of Appeals too narrowly protected against inquiries that a grand jury could direct to third parties. We granted both petitions. 405 U. S. 916 (1972).

I

Because the claim is that a Member's aide shares the Member's constitutional privilege, we consider first whether and to what extent Senator Gravel himself is exempt from process or inquiry by a grand jury investigating the commission of a crime. Our frame of reference is Art. I, § 6, cl. 1, of the Constitution:

"The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United

States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."

The last sentence of the Clause provides Members of Congress with two distinct privileges. Except in cases of "Treason, Felony and Breach of the Peace," the Clause shields Members from arrest while attending or traveling to and from a session of their House. History reveals, and prior cases so hold, that this part of the Clause exempts Members from arrest in civil cases only. "When the Constitution was adopted, arrests in civil suits were still common in America. It is only to such arrests that the provision applies." *Long* v. *Ansell*, 293 U. S. 76, 83 (1934) (footnote omitted). "Since . . . the terms treason, felony and breach of the peace, as used in the constitutional provision relied upon, excepts from the operation of the privilege all criminal offenses, the conclusion results that the claim of privilege of exemption from arrest and sentence was without merit . . . ." *Williamson* v. *United States,* 207 U. S. 425, 446 (1908).[10] Nor does freedom from arrest confer immunity on a Member from service of process as a defendant in civil matters, *Long* v. *Ansell, supra,* at

---

[10] Williamson, United States Congressman, had been found guilty of conspiring to commit subornation of perjury in connection with proceedings for the purchase of public land. He objected to the court's passing sentence upon him and particularly protested that any imprisonment would deprive him of his constitutional right to "go to, attend at and return from the ensuing session of Congress." *Williamson* v. *United States,* 207 U. S. 425, 433 (1908). The Court rejected the contention that the Speech or Debate Clause freed legislators from accountability for criminal conduct.

82–83, or as a witness in a criminal case. "The constitution gives to every man, charged with an offence, the benefit of compulsory process, to secure the attendance of his witnesses. I do not know of any privilege to exempt members of congress from the service, or the obligations, of a *subpoena*, in such cases." *United States* v. *Cooper,* 4 Dall. 341 (1800) (Chase, J., sitting on Circuit). It is, therefore, sufficiently plain that the constitutional freedom from arrest does not exempt Members of Congress from the operation of the ordinary criminal laws, even though imprisonment may prevent or interfere with the performance of their duties as Members. *Williamson* v. *United States, supra;* cf. *Burton* v. *United States,* 202 U. S. 344 (1906). Indeed, implicit in the narrow scope of the privilege of freedom from arrest is, as Jefferson noted, the judgment that legislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons. T. Jefferson, Manual of Parliamentary Practice, S. Doc. No. 92–1, p. 437 (1971).

In recognition, no doubt, of the force of this part of § 6, Senator Gravel disavows any assertion of general immunity from the criminal law. But he points out that the last portion of § 6 affords Members of Congress another vital privilege—they may not be questioned in any other place for any speech or debate in either House. The claim is not that while one part of § 6 generally permits prosecutions for treason, felony, and breach of the peace, another part nevertheless broadly forbids them. Rather, his insistence is that the Speech or Debate Clause at the very least protects him from criminal or civil liability and from questioning elsewhere than in the Senate, with respect to the events occurring at the subcommittee hearing at which the Pentagon Papers were introduced into the public record. To us this claim is incontrovertible.

The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch. It thus protects Members against prosecutions that directly impinge upon or threaten the legislative process. We have no doubt that Senator Gravel may not be made to answer—either in terms of questions or in terms of defending himself from prosecution—for the events that occurred at the subcommittee meeting. Our decision is made easier by the fact that the United States appears to have abandoned whatever position it took to the contrary in the lower courts.

Even so, the United States strongly urges that because the Speech or Debate Clause confers a privilege only upon "Senators and Representatives," Rodberg himself has no valid claim to constitutional immunity from grand jury inquiry. In our view, both courts below correctly rejected this position. We agree with the Court of Appeals that for the purpose of construing the privilege a Member and his aide are to be "treated as one," *United States* v. *Doe,* 455 F. 2d, at 761; or, as the District Court put it: the "Speech or Debate Clause prohibits inquiry into things done by Dr. Rodberg as the Senator's agent or assistant which would have been legislative acts, and therefore privileged, if performed by the Senator personally." *United States* v. *Doe,* 332 F. Supp., at 937–938. Both courts recognized what the Senate of the United States urgently presses here: that it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the

Members' performance that they must be treated as the latter's alter egos; and that if they are not so recognized, the central role of the Speech or Debate Clause—to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary, *United States* v. *Johnson,* 383 U. S. 169, 181 (1966)—will inevitably be diminished and frustrated.

The Court has already embraced similar views in *Barr* v. *Matteo,* 360 U. S. 564 (1959), where, in immunizing the Acting Director of the Office of Rent Stabilization from liability for an alleged libel contained in a press release, the Court held that the executive privilege recognized in prior cases could not be restricted to those of cabinet rank. As stated by Mr. Justice Harlan, the "privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy." *Id.,* at 572–573 (footnote omitted).

It is true that the Clause itself mentions only "Senators and Representatives," but prior cases have plainly not taken a literalistic approach in applying the privilege. The Clause also speaks only of "Speech or Debate," but the Court's consistent approach has been that to confine the protection of the Speech or Debate Clause to words spoken in debate would be an unacceptably narrow view. Committee reports, resolutions, and the act of voting are equally covered; "[i]n short, . . . things generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn* v. *Thompson,* 103 U. S. 168, 204 (1881), quoted

with approval in *United States* v. *Johnson,* 383 U. S., at 179. Rather than giving the Clause a cramped construction, the Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator. We have little doubt that we are neither exceeding our judicial powers nor mistakenly construing the Constitution by holding that the Speech or Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself.

Nor can we agree with the United States that our conclusion is foreclosed by *Kilbourn* v. *Thompson, supra, Dombrowski* v. *Eastland,* 387 U. S. 82 (1967), and *Powell* v. *McCormack,* 395 U. S. 486 (1969), where the speech or debate privilege was held unavailable to certain House and committee employees. Those cases do not hold that persons other than Members of Congress are beyond the protection of the Clause when they perform or aid in the performance of legislative acts. In *Kilbourn,* the Speech or Debate Clause protected House Members who had adopted a resolution authorizing Kilbourn's arrest; that act was clearly legislative in nature. But the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights as it did there. That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest. The Court quoted with approval from *Stockdale* v. *Hansard,* 9 Ad. & E. 1, 112 Eng. Rep. 1112 (K. B. 1839): " 'So if the speaker by authority of the House order an illegal act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his reve-

nue officer,' " 103 U. S., at 202.[11]   The Speech or Debate Clause could not be construed to immunize an illegal arrest even though directed by an immune legislative act.   The Court was careful to point out that the Members themselves were not implicated in the actual arrest, *id.*, at 200, and, significantly enough, reserved the question whether there might be circumstances in which "there may . . . be things done, *in the one House or the other*, of an extraordinary character, for which the members who take part in the act may be held legally responsible."   103 U. S., at 204 (emphasis added).

*Dombrowski* v. *Eastland, supra,* is little different in principle.   The Speech or Debate Clause there protected a Senator, who was also a subcommittee chairman, but not the subcommittee counsel.   The record contained no evidence of the Senator's involvement in any activity that could result in liability, 387 U. S., at 84, whereas the committee counsel was charged with conspiring with state officials to carry out an illegal seizure of records that the committee sought for its own proceedings. *Ibid.*   The committee counsel was deemed protected to

---

[11] In *Kilbourn* v. *Thompson,* 103 U. S. 168, 198 (1881), the Court noted a second example, used by Mr. Justice Coleridge in *Stockdale* v. *Hansard,* 9 Ad. & E. 1, 225–226, 112 Eng. Rep. 1112, 1196–1197 (K. B. 1839): " 'Let me suppose, by way of illustration, an extreme case; the House of Commons resolves that any one wearing a dress of a particular manufacture is guilty of a breach of privilege, and orders the arrest of such persons by the constable of the parish.   An arrest is made and action brought, to which the order of the House is pleaded as a justification. . . .   In such a case as the one supposed, the plaintiff's counsel would insist on the distinction between power and privilege; and no lawyer can seriously doubt that it exists: but the argument confounds them, and forbids us to enquire, in any particular case, whether it ranges under the one or the other.   I can find no principle which sanctions this.' "

some extent by legislative privilege, but it did not shield him from answering as yet unproved charges of conspiring to violate the constitutional rights of private parties. Unlawful conduct of this kind the Speech or Debate Clause simply did not immunize.

*Powell* v. *McCormack* reasserted judicial power to determine the validity of legislative actions impinging on individual rights—there the illegal exclusion of a representative-elect—and to afford relief against House aides seeking to implement the invalid resolutions. The Members themselves were dismissed from the case because shielded by the Speech or Debate Clause both from liability for their illegal legislative act and from having to defend themselves with respect to it. As in *Kilbourn,* the Court did not reach the question "whether under the Speech or Debate Clause petitioners would be entitled to maintain this action solely against the members of Congress where no agents participated in the challenged action and no other remedy was available." 395 U. S., at 506 n. 26.

None of these three cases adopted the simple proposition that immunity was unavailable to congressional or committee employees because they were not Representatives or Senators; rather, immunity was unavailable because they engaged in illegal conduct that was not entitled to Speech or Debate Clause protection. The three cases reflect a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings. In *Kilbourn,* the Sergeant-at-Arms was executing a legislative order, the issuance of which fell within the Speech or Debate Clause; in *Eastland,* the committee counsel was gathering information for a hearing; and in *Powell,* the

Clerk and Doorkeeper were merely carrying out directions that were protected by the Speech or Debate Clause. In each case, protecting the rights of others may have to some extent frustrated a planned or completed legislative act; but relief could be afforded without proof of a legislative act or the motives or purposes underlying such an act. No threat to legislative independence was posed, and Speech or Debate Clause protection did not attach.

None of this, as we see it, involves distinguishing between a Senator and his personal aides with respect to legislative immunity. In *Kilbourn*-type situations, both aide and Member should be immune with respect to committee and House action leading to the illegal resolution. So, too, in *Eastland,* as in this litigation, senatorial aides should enjoy immunity for helping a Member conduct committee hearings. On the other hand, no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen. Neither they nor their aides should be immune from liability or questioning in such circumstances. Such acts are no more essential to legislating than the conduct held unprotected in *United States* v. *Johnson,* 383 U. S. 169 (1966).[12]

The United States fears the abuses that history reveals have occurred when legislators are invested with the power to relieve others from the operation of otherwise valid civil and criminal laws. But these abuses, it seems to us, are for the most part obviated if the privilege applicable to the aide is viewed, as it must be, as the

---

[12] Senator Gravel is willing to assume that if he personally had "stolen" the Pentagon Papers, and that act were a crime, he could be prosecuted, as could aides or other assistants who participated in the theft. Consolidated Brief for Senator Gravel 93.

privilege of the Senator, and invocable only by the Senator or by the aide on the Senator's behalf,[13] and if in all events the privilege available to the aide is confined to those services that would be immune legislative conduct if performed by the Senator himself. This view places beyond the Speech or Debate Clause a variety of services characteristically performed by aides for Members of Congress, even though within the scope of their employment. It likewise provides no protection for criminal conduct threatening the security of the person or property of others, whether performed at the direction of the Senator in preparation for or in execution of a legislative act or done without his knowledge or direction. Neither does it immunize Senator or aide from testifying at trials or grand jury proceedings involving third-party crimes where the questions do not require testimony about or impugn a legislative act. Thus our refusal to distinguish between Senator and aide in applying the Speech or Debate Clause does not mean that Rodberg is for all purposes exempt from grand jury questioning.

## II

We are convinced also that the Court of Appeals correctly determined that Senator Gravel's alleged arrangement with Beacon Press to publish the Pentagon Papers was not protected speech or debate within the meaning of Art. I, § 6, cl. 1, of the Constitution.

Historically, the English legislative privilege was not viewed as protecting republication of an otherwise immune libel on the floor of the House. *Stockdale* v. *Hansard,* 9 Ad. & E., at 114, 112 Eng. Rep., at 1156, recognized that "[f]or speeches made in Parliament by a member to the prejudice of any other person, or hazardous

---

[13] It follows that an aide's claim of privilege can be repudiated and thus waived by the Senator.

to the public peace, that member enjoys complete impunity." But it was clearly stated that "if the calumnious or inflammatory speeches should be reported and published, the law will attach responsibility on the publisher." [14]

[14] *Stockdale* extensively reviewed the precedents and their interplay with the privilege so forcefully recognized in the Bill of Rights of 1689: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 W. & M., Sess. 2, c. 2. From these cases, including *Rex* v. *Creevey*, 1 M. & S. 273, 105 Eng. Rep. 102 (K. B. 1813); *Rex* v. *Wright*, 8 T. R. 293, 101 Eng. Rep. 1396 (K. B. 1799); *Rex* v. *Abingdon*, 1 Esp. 226, 170 Eng. Rep. 337 (N. P. 1794); *Rex* v. *Williams*, 2 Show. K. B. 471, 89 Eng. Rep. 1048 (1686), it is apparent that to the extent English precedent is relevant to the Speech or Debate Clause there is little, if any, support for Senator Gravel's position with respect to republication. Parliament reacted to *Stockdale* v. *Hansard* by adopting the Parliamentary Papers Act of 1840, 3 & 4 Vict., c. 9, which stayed proceedings in all cases where it could be shown that publication was by order of a House of Parliament and was a bona fide report, printed and circulated without malice. See generally C. Wittke, The History of English Parliamentary Privilege (1921).

Gravel urges that *Stockdale* v. *Hansard* was later repudiated in *Wason* v. *Walter*, L. R. 4 Q. B. 73 (1868), which held a proprietor immune from civil libel for an accurate republication of a debate in the House of Lords. But the immunity established in *Wason* was not founded on parliamentary privilege, *id.*, at 84, but upon analogy to the privilege for reporting judicial proceedings. *Id.*, at 87–90. The *Wason* court stated its "unhesitating and unqualified adhesion" to the "masterly judgments" rendered in *Stockdale* and characterized the question before it as whether republication, quite apart from any assertion of parliamentary privilege, was "in itself privileged and lawful." *Id.*, at 86–87. That the privileges for nonmalicious republication of parliamentary and judicial proceedings—later established as qualified—were construed as coextensive in all respects, *id.*, at 95, further underscores the inappositeness of reading *Wason* as based upon parliamentary privilege that, like the Speech or Debate Clause, is absolute. Much later Holdsworth was to comment that at the time of *Wason* the distinction between absolute and qualified privilege had not been worked out and that the "part played by

This was accepted in *Kilbourn* v. *Thompson* as a "sound statement of the legal effect of the Bill of Rights and of the parliamentary law of England" and as a reasonable basis for inferring "that the framers of the Constitution meant the same thing by the use of language borrowed from that source." 103 U. S., at 202.

Prior cases have read the Speech or Debate Clause "broadly to effectuate its purposes," *United States* v. *Johnson,* 383 U. S., at 180, and have included within its reach anything "generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn* v. *Thompson,* 103 U. S., at 204; *United States* v. *Johnson,* 383 U. S., at 179. Thus, voting by Members and committee reports are protected; and we recognize today—as the Court has recognized before, *Kilbourn* v. *Thompson,* 103 U. S., at 204; *Tenney* v. *Brandhove,* 341 U. S. 367, 377–378 (1951)—that a Member's conduct at legislative committee hearings, although subject to judicial review in various circumstances, as is legislation itself, may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the "sphere of legitimate legislative activity." *Id.,* at 376.[15]

But the Clause has not been extended beyond the legis-

---

malice in the tort and crime of defamation" probably helped retard recognition of a qualified privilege. 8 W. Holdsworth, History of English Law 377 (1926).

[15] The Court in *Tenney* v. *Brandhove,* 341 U. S. 367, 376–377 (1951), was equally clear that "legislative activity" is not all-encompassing, nor may its limits be established by the Legislative Branch: "Legislatures may not of course acquire power by an unwarranted extension of privilege. The House of Commons' claim of power to establish the limits of its privilege has been little more than a pretense since *Ashby* v. *White,* 2 Ld. Raym. 938, 3 *id.* 320. This Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role. *Kilbourn* v. *Thompson,* 103 U. S. 168; *Marshall* v. *Gordon,* 243 U. S. 521; compare *McGrain* v. *Daugherty,* 273 U. S. 135, 176."

lative sphere. That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature. Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity. *United States* v. *Johnson* decided at least this much. "No argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process." 383 U. S., at 172. Cf. *Burton* v. *United States,* 202 U. S., at 367–368.

Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but "only when necessary to prevent indirect impairment of such deliberations." *United States* v. *Doe,* 455 F. 2d, at 760.

Here, private publication by Senator Gravel through the cooperation of Beacon Press was in no way essential to the deliberations of the Senate; nor does questioning as to private publication threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence. The Senator

had conducted his hearings; the record and any report that was forthcoming were available both to his committee and the Senate. Insofar as we are advised, neither Congress nor the full committee ordered or authorized the publication.[16] We cannot but conclude that the Senator's arrangements with Beacon Press were not part and parcel of the legislative process.

There are additional considerations. Article I, § 6, cl. 1, as we have emphasized, does not purport to confer a general exemption upon Members of Congress from liability or process in criminal cases. Quite the contrary is true. While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts. If republication of these classified papers would be a crime under an Act of Congress, it would not be entitled to immunity under the Speech or Debate Clause. It also appears that the grand jury was pursuing this very subject in the normal course of a valid investigation. The Speech or Debate Clause does not in our view extend immunity to Rodberg, as a Senator's aide, from testifying before the grand jury about the arrangement between Senator Gravel and Beacon Press or about his own participation, if any, in the

---

[16] The sole constitutional claim asserted here is based on the Speech or Debate Clause. We need not address issues that may arise when Congress or either House, as distinguished from a single Member, orders the publication and/or public distribution of committee hearings, reports, or other materials. Of course, Art. I, § 5, cl. 3, requires that each House "keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy . . . ." This Clause has not been the subject of extensive judicial examination. See *Field* v. *Clark*, 143 U. S. 649, 670–671 (1892); *United States* v. *Ballin*, 144 U. S. 1, 4 (1892).

alleged transaction, so long as legislative acts of the Senator are not impugned.

## III

Similar considerations lead us to disagree with the Court of Appeals insofar as it fashioned, tentatively at least, a nonconstitutional testimonial privilege protecting Rodberg from any questioning by the grand jury concerning the matter of republication of the Pentagon Papers. This privilege, thought to be similar to that protecting executive officials from liability for libel, see *Barr* v. *Matteo,* 360 U. S. 564 (1959), was considered advisable "[t]o the extent that a congressman has responsibility to inform his constituents . . . ." 455 F. 2d, at 760. But we cannot carry a judicially fashioned privilege so far as to immunize criminal conduct proscribed by an Act of Congress or to frustrate the grand jury's inquiry into whether publication of these classified documents violated a federal criminal statute. The so-called executive privilege has never been applied to shield executive officers from prosecution for crime, the Court of Appeals was quite sure that third parties were neither immune from liability nor from testifying about the republication matter, and we perceive no basis for conferring a testimonial privilege on Rodberg as the Court of Appeals seemed to do.

## IV

We must finally consider, in the light of the foregoing, whether the protective order entered by the Court of Appeals is an appropriate regulation of the pending grand jury proceedings.

Focusing first on paragraph two of the order, we think the injunction against interrogating Rodberg with respect to any act, "in the broadest sense," performed by him within the scope of his employment, overly restricts

the scope of grand jury inquiry. Rodberg's immunity, testimonial or otherwise, extends only to legislative acts as to which the Senator himself would be immune. The grand jury, therefore, if relevant to its investigation into the possible violations of the criminal law, and absent Fifth Amendment objections, may require from Rodberg answers to questions relating to his or the Senator's arrangements, if any, with respect to republication or with respect to third-party conduct under valid investigation by the grand jury, as long as the questions do not implicate legislative action of the Senator. Neither do we perceive any constitutional or other privilege that shields Rodberg, any more than any other witness, from grand jury questions relevant to tracing the source of obviously highly classified documents that came into the Senator's possession and are the basic subject matter of inquiry in this case, as long as no legislative act is implicated by the questions.[17]

Because the Speech or Debate Clause privilege applies both to Senator and aide, it appears to us that paragraph one of the order, alone, would afford ample protection for the privilege if it forbade questioning any witness, including Rodberg: (1) concerning the Sen-

---

[17] The Court of Appeals held that the Speech or Debate Clause protects aides as well as Senators and that while third parties may be questioned about the source of a Senator's information, neither aide nor Senator need answer such inquiries. The Government's position is that the aide has no protection under the Speech or Debate Clause and may be questioned even about legislative acts. A contrary ruling, the Government fears, would invite great abuse. On the other hand, Gravel contends that the Court of Appeals insufficiently protected the Senator both with respect to the matter of republication and with respect to the scope of inquiry permitted the grand jury in questioning third-party witnesses with whom the Senator and his aides dealt. Hence, we are of the view that both the question of the aide's immunity and the question of the extent of that immunity are properly before us in this case. And surely we are not bound by the Government's view of the scope of the privilege.

ator's conduct, or the conduct of his aides, at the June 29, 1971, meeting of the subcommittee; [18] (2) concerning the motives and purposes behind the Senator's conduct, or that of his aides, at that meeting; (3) concerning communications between the Senator and his aides during the term of their employment and related to said meeting or any other legislative act of the Senator; (4) except as it proves relevant to investigating possible third-party crime, concerning any act, in itself not criminal, performed by the Senator, or by his aides in the course of their employment, in preparation for the subcommittee hearing. We leave the final form of such an order to the Court of Appeals in the first instance, or, if that court prefers, to the District Court.

The judgment of the Court of Appeals is vacated and the cases are remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE STEWART, dissenting in part.

The Court today holds that the Speech or Debate Clause does not protect a Congressman from being forced to testify before a grand jury about sources of information

---

[18] Having established that neither the Senator nor Rodberg is subject to liability for what occurred at the subcommittee hearing, we perceive no basis for inquiry of either Rodberg or third parties on this subject. If it proves material to establish for the record the fact of publication at the subcommittee hearing, which seems undisputed, the public record of the hearing would appear sufficient for this purpose. We do not intend to imply, however, that in no grand jury investigations or criminal trials of third parties may third-party witnesses be interrogated about legislative acts of Members of Congress. As for inquiry of Rodberg about third-party crimes, we are quite sure that the District Court has ample power to keep the grand jury proceedings within proper bounds and to foreclose improvident harassment and fishing expeditions into the affairs of a Member of Congress that are no proper concern of the grand jury or the Executive Branch.

used in preparation for legislative acts. This critical question was not embraced in the petitions for certiorari. It was not dealt with in the written briefs. It was addressed only tangentially during the oral arguments. Yet it is a question with profound implications for the effective functioning of the legislative process. I cannot join in the Court's summary resolution of so vitally important a constitutional issue.

In preparing for legislative hearings, debates, and roll calls, a member of Congress obviously needs the broadest possible range of information. Valuable information may often come from sources in the Executive Branch or from citizens in private life. And informants such as these may be willing to relate information to a Congressman only in confidence, fearing that disclosure of their identities might cause loss of their jobs or harassment by their colleagues or employers. In fact, I should suppose it to be self-evident that many such informants would insist upon an assurance of confidentiality before revealing their information. Thus, the acquisition of knowledge through a promise of nondisclosure of its source will often be a necessary concomitant of effective legislative conduct, if the members of Congress are properly to perform their constitutional duty.

The Court of Appeals for the First Circuit recognized the importance of the information-gathering process in the performance of the legislative function. It held that the Speech or Debate Clause bars all grand jury questioning of a member of Congress regarding the sources of his information. The Court of Appeals reasoned that to allow a "grand jury to question a senator about his sources would chill both the vigor with which legislators seek facts, and the willingness of potential sources to supply them." *United States* v. *Doe*, 455 F. 2d 753, 758–759. The Government *did not seek review of this ruling,* but rather sought certiorari on the question whether the

Speech or Debate Clause bars a grand jury from questioning congressional aides about privileged actions of Senators or Representatives.[1]

The Court, however, today decides, *sua sponte,* that a Member of Congress may, despite the Speech or Debate Clause, be compelled to testify before a grand jury concerning the sources of information used by him in the performance of his legislative duties, if such an inquiry *"proves relevant to investigating possible third-party crime." Ante,* at 629 (emphasis supplied).[2] In my view, this ruling is highly dubious in view of the basic purpose of the Speech or Debate Clause—"to prevent intimidation [of Congressmen] by the executive and accountability before a possibly hostile judiciary." *United States* v. *Johnson,* 383 U. S. 169, 181.

Under the Court's ruling, a Congressman may be subpoenaed by a vindictive Executive to testify about informants who have not committed crimes and who have no knowledge of crime. Such compulsion can occur, because the judiciary has traditionally imposed virtually no limitations on the grand jury's broad investigatory powers; grand jury investigations are not limited in scope

---

[1] As stated in its petition for certiorari, the Government asked us to consider:

"Whether Article 1, Section 6, of the Constitution providing that '. . . for any Speech or Debate in either House,' the Senators and Representatives 'shall not be questioned in any other Place' bars a grand jury from questioning aides of members of Congress and other persons about matters that may touch on activities of a member of Congress which are protected 'Speech or Debate.' "

The Government also asked us to consider:

"Whether an aide of a member of Congress has a common law privilege not to testify before a grand jury concerning private republication of material which his Senator-employer had introduced into the record of a Senate subcommittee."

We granted certiorari on both questions. 405 U. S. 916.

[2] See also *ante,* at 622, 628.

to specific criminal acts, and standards of materiality and relevance are greatly relaxed.[3] But even if the Executive had reason to believe that a Member of Congress had knowledge of a specific probable violation of law, it is by no means clear to me that the Executive's interest in the administration of justice must *always* override the public interest in having an informed Congress. Why should we not, given the tension between two competing interests, *each* of constitutional dimensions, balance the claims of the Speech or Debate Clause against the claims of the grand jury in the particularized contexts of specific cases? And why are not the Houses of Congress the proper institutions in most situations to impose sanctions upon a Representative or Senator who withholds information about crime acquired in the course of his legislative duties?[4]

---

[3] See, *e. g., Wilson* v. *United States,* 221 U. S. 361; *Hendricks* v. *United States,* 223 U. S. 178; *United States* v. *Johnson,* 319 U. S. 503. See generally *Holt* v. *United States,* 218 U. S. 245; *Costello* v. *United States,* 350 U. S. 359.

[4] During oral argument, the Solicitor General virtually conceded, in the course of arguing that aides should not enjoy the same testimonial privilege as Congressmen, that a Senator could *not* be called before the grand jury to testify about the sources of his information:

"Q. Mr. Solicitor, am I correct that you wouldn't be able to question the Senator as to where he got the papers from?

"A. Oh, Mr. Justice, we are not able to question the Senator about anything insofar as it relates to speech or debate.

"Q. Well, this was related, you agree, to speech and debate?

"A. I am not contending to the contrary. . . ." Tr. of Oral Arg., Apr. 20, 1972, pp. 27–28.

The following exchange also took place:

"Q. You can't ask a Senator where you got the material you used in your speech.

"A. Yes, Mr. Justice.

"Q. You can't.

"A. Yes." *Id.,* at 29.

At another point in the oral argument, the Solicitor General said

I am not prepared to accept the Court's rigid conclusion that the Executive may always compel a legislator to testify before a grand jury about sources of information used in preparing for legislative acts. For that reason, I dissent from that part of the Court's opinion that so inflexibly and summarily decides this vital question.

MR. JUSTICE DOUGLAS, dissenting.

I would construe the Speech or Debate Clause [1] to insulate Senator Gravel and his aides from inquiry concerning the Pentagon Papers, and Beacon Press from inquiry concerning publication of them, for that publication was but another way of informing the public as to what had gone on in the privacy of the Executive Branch concerning the conception and pursuit of the so-called "war" in Vietnam. Alternatively, I would hold that Beacon Press is protected by the First Amendment from prosecution or investigations for publishing or undertaking to publish the Pentagon Papers.

Gravel, Senator from Alaska, was Chairman of the Senate Subcommittee on Public Buildings and Grounds. He convened a meeting of the Subcommittee and read to it a summary of the so-called Pentagon Papers. He then introduced "the entire Papers, allegedly some 47 volumes and said to contain seven million words, as an

that even when a Senator or Representative has knowledge of crime as a result of legislative acts "[t]hey can't even be required to respond to questions with respect to their speeches and debates. That is a great and historic privilege which ought to be maintained which I fully support but which does not extend to any other persons than Senators and Representatives." *Id.*, at 32.

[1] The Speech or Debate Clause included in Art. I, § 6, cl. 1, of the Constitution provides as respects Senators and Representatives that "for any Speech or Debate in either House, they shall not be questioned in any other Place."

exhibit." 455 F. 2d 753, 756. Thereafter, he supplied a copy of the papers to the Beacon Press, a Boston publishing house, on the understanding that it would publish the papers without profit to the Senator. A grand jury was investigating the release of the Pentagon Papers and subpoenaed one Rodberg, an aide to Senator Gravel, to testify. Rodberg moved to quash the subpoena; and on the same day the Senator moved to intervene. Intervention was granted and in due course the Court of Appeals entered the following order which is now before us for review:

"(1) No witness before the grand jury currently investigating the release of the Pentagon Papers may be questioned about Senator Mike Gravel's conduct at a meeting of the Subcommittee on Public Buildings and Grounds on June 29, 1971, nor, if the questions are directed to the motives or purposes behind the Senator's conduct at that meeting, about any communications with him or with his aides regarding the activities of the Senator or his aides during the period of their employment, in preparation for and related to said meeting.

"(2) Dr. Leonard S. Rodberg may not be questioned about his own actions in the broadest sense, including observations and communications, oral or written, by or to him or coming to his attention while being interviewed for, or after having been engaged as a member of Senator Gravel's personal staff to the extent that they were in the course of his employment."

## I

Both the introduction of the Pentagon Papers by Senator Gravel into the record before his Subcommittee and his efforts to publish them were clearly covered by

the Speech or Debate Clause, as construed in *Kilbourn* v. *Thompson,* 103 U. S. 168, 204:

> "It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by passing between the tellers. In short, to things generally done in a session of the House by one of its members in relation to the business before it." [2]

One of the things normally done by a Member "in relation to the business before it" is the introduction of documents or other exhibits in the record the committee or subcommittee is making. The introduction of a document into a record of the Committee or subcommittee by its Chairman certainly puts it in the public domain. Whether a particular document is relevant to the inquiry of the committee may be questioned by the Senate in the exercise of its power to prescribe rules for the governance and discipline of wayward members. But there is only one instance, as I see it, where supervisory power over that issue is vested in the courts, and that is where a witness before a committee is prosecuted for contempt and he makes the defense that the question he refused to answer was not germane to the legislative inquiry or within its permissible range. See *Uphaus* v. *Wyman,* 360 U. S. 72; *Kilbourn* v. *Thompson, supra,* at 190.

In all other situations, however, the judiciary's view of the motives or germaneness of a Senator's conduct

---

[2] And see *United States* v. *Johnson,* 383 U. S. 169, 172, 177; and *Tenney* v. *Brandhove,* 341 U. S. 367, 376.

before a committee is irrelevant. For, "[t]he claim of an unworthy purpose does not destroy the privilege." *Tenney* v. *Brandhove,* 341 U. S. 367, 377. If there is an abuse, there is a remedy; but it is legislative, not judicial.

As to Senator Gravel's efforts to publish the Subcommittee record's contents, wide dissemination of this material as an educational service is as much a part of the Speech or Debate Clause philosophy as mailing under a frank a Senator's or a Congressman's speech across the Nation. As mentioned earlier, "[i]t is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. . . . The informing function of Congress should be preferred even to its legislative function." W. Wilson, Congressional Government 303 (1885), quoted with approval in *Tenney* v. *Brandhove, supra,* at 377 n. 6. "From the earliest times in its history, the Congress has assiduously performed an 'informing function,'" *Watkins* v. *United States,* 354 U. S. 178, 200 n. 33. "Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them." *Bond* v. *Floyd,* 385 U. S. 116, 136.

We said in *United States* v. *Johnson,* 383 U. S. 169, 179, that the Speech or Debate Clause established a "legislative privilege" that protected a member of Congress against prosecution "by an unfriendly executive and conviction by a hostile judiciary" in order, as Mr. Justice Harlan put it, to ensure "the independence of the legislature." That hostility emanates from every stage of the present proceedings. It emphasizes the need to construe the Speech or Debate Clause generously, not niggardly. If republication of a Senator's speech in a newspaper carries the privilege, as it doubtless does, then republication of the exhibits introduced

at a hearing before Congress must also do so. That means that republication by Beacon Press is within the ambit of the Speech or Debate Clause and that the confidences of the Senator in arranging it are not subject to inquiry "in any other Place" than the Congress.

It is said that though the Senator is immune from questioning as to what he said and did in preparation for the committee hearing and in conducting it, his aides may be questioned in his stead. Such easy circumvention of the Speech or Debate Clause would indeed make it a mockery. The aides and agents such as Beacon Press must be taken as surrogates for the Senator and the confidences of the job that they enjoy are his confidences that the Speech or Debate Clause embraces.

## II

The secrecy of documents in the Executive Department has been a bone of contention between it and Congress from the beginning.[3] Most discussions have

---

[3] See Developments In The Law—The National Security Interest and Civil Liberties, 85 Harv. L. Rev. 1130, 1207–1215 (1972); Note, The Right of Government Employees to Furnish Information to Congress: Statutory and Constitutional Aspects, 57 Va. L. Rev. 885–887 (1971); Berger, Executive Privilege v. Congressional Inquiry, 12 U. C. L. A. L. Rev. 1044 (1965); Schwartz, Executive Privilege and Congressional Investigatory Power, 47 Calif. L. Rev. 3 (1959); Executive Privilege: The Withholding of Information by the Executive, Hearing on S. 1125 before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 92d Cong., 1st Sess. (1971). There is no express statutory authority for the classification procedure used currently by the bureaucracies, although it has been claimed that Congress has recognized it in such measures as the exemptions from the disclosure requirements of the Freedom of Information Act, 5 U. S. C. § 552 (b) and the espionage laws, 18 U. S. C. §§ 792–799. Rather, the classification regime has been implemented through a series of executive orders

centered on the scope of the executive privilege in stamping documents as "secret," "top secret," "confidential," and so on, thus withholding them from the eyes of Congress and the press. The practice has reached large proportions, it being estimated that

(1) Over 30,000 people in the Executive Branch have the power to wield the classification stamp.[4]

(2) The Department of State, the Department of Defense, and the Atomic Energy Commission have over 20 million classified documents in their files.

(3) Congress appropriates approximately $15 billion annually without most of its members or the public or the press knowing for what purposes the money is to be used.[5]

The problem looms large as one of separation of

---

described in Developments In The Law, *supra,* at 1192–1198. It has also been claimed that several sections of Art. II (such as the designation of the President as Commander in Chief of the Army and Navy) confer upon the Executive an inherent power to classify documents. See Report of the Commission on Government Security, S. Doc. No. 64, 85th Cong., 1st Sess., 158 (1957).

[4] Hearings on S. 1125, *supra,* n. 3, at 517–518. One estimate of the number of officials who can classify documents is even higher. In the Department of Defense alone, 803 persons have the authority to classify documents Top Secret; 7,687 have permission to stamp them Secret, and 31,048 have the authorization to denominate papers Confidential. United States Government Information Policies and Practices—The Pentagon Papers, Hearings before a Subcommittee of the House Committee on Government Operations, 92d Cong., 1st Sess., pt. 2, p. 599 (statement of David Cooke, Deputy Assistant Secretary of Defense).

[5] Senator Fulbright, chairman of the Senate Foreign Relations Committee, recently testified that his committee had been so unsuccessful in obtaining accurate information about the Vietnam war from the Executive Branch that it was required to hire its own investigators and send them to Southeast Asia. Hearings on S. 1125, *supra,* n. 3, at 206.

powers. Woodrow Wilson wrote about it in terms of the "informing function" of Congress: [6]

> "It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred even to its legislative function. The argument is not only that discussed and interrogated administration is the only pure and efficient administration, but, more than that, that the only really self-governing people is that people which discusses and interrogates its administration. The talk on the part of Congress which we sometimes justly condemn is the profitless squabble of words over frivolous bills or selfish party issues. It would be hard to conceive of there being too much talk about the practical concerns and processes of government. Such talk it is which, when earnestly and purposefully conducted, clears the public mind and shapes the demands of public opinion."

Classification of documents is a concern of the Congress. It is, however, no concern of the courts, as I see it, how a

---

[6] Congressional Government 303–304 (1885).

document is stamped in an Executive Department or whether a committee of Congress can obtain the use of it. The federal courts do not sit as an ombudsman refereeing the disputes between the other two branches. The federal courts do become vitally involved whenever their power is sought to be invoked either to protect the press against censorship as in *New York Times Co.* v. *United States,* 403 U. S. 713, or to protect the press against punishment for publishing "secret" documents or to protect an individual against his disclosure of their contents for any of the purposes of the First Amendment.

Forcing the press to become the Government's co-conspirator in maintaining state secrets is at war with the objectives of the First Amendment. That guarantee was designed in part to ensure a meaningful version of self-government by immersing the people in a "steady, robust, unimpeded, and uncensored flow of opinion and reporting which are continuously subjected to critique, rebuttal, and re-examination." *Branzburg* v. *Hayes, post,* at 715 (DOUGLAS, J., dissenting); *Brandenburg* v. *Ohio,* 395 U. S. 444; *Stanley* v. *Georgia,* 394 U. S. 557, 564; *Lamont* v. *Postmaster General,* 381 U. S. 301, 308 (BRENNAN, J., concurring); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270. As I have said, in dissent, elsewhere, *e. g., Branzburg, supra; Kleindienst* v. *Mandel, post,* at 771, that Amendment is aimed at protecting not only speakers and writers but also listeners and readers. The essence of our form of governing was at the heart of Mr. Justice Black's reminder in the Pentagon Papers case that "[t]he press was protected so that it could bare the secrets of government and inform the people." 403 U. S., at 717 (concurring opinion). Similarly, Senator Sam Ervin has observed: "When the people do not know what their government is doing, those who govern are not accountable for their actions—and accountability is basic to the democratic system. By using devices of secrecy, the gov-

ernment attains the power to 'manage' the news and through it to manipulate public opinion." [7]   Ramsey Clark as Attorney General expressed a similar sentiment: "If government is to be truly of, by, and for the people, the people must know in detail the activities of government.   Nothing so diminishes democracy as secrecy." [8] And see Meiklejohn, The First Amendment Is An Absolute, 1961 Sup. Ct. Rev. 245; Press Freedoms Under Pressure: Report of the Twentieth Century Fund Task Force on the Government and the Press 109–117 (1972) (background paper by Fred Graham on access to news); M. Johnson, The Government Secrecy Controversy 39–41 (1967).

Jefferson in a letter to Madison, dated December 20, 1787, posed the question "whether peace is best preserved by giving energy to the government, or information to the people," and then answered, "This last is the most certain, and the most legitimate engine of government." 6 Writings of Thomas Jefferson 392 (Memorial ed. 1903).

Madison at the time of the Whiskey Rebellion spoke in the House against a resolution of censure against the groups stirring up the turmoil against that rebellion.

> " 'If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people.' "   Brant, The Madison Heritage, 35 N. Y. U. L. Rev. 882, 900.

Yet, as has been revealed by such exposés as the Pentagon Papers, the My Lai massacres, the Gulf of Tonkin "incident," and the Bay of Pigs invasion, the Government usually suppresses damaging news but high-

---

[7] Secrecy in a Free Society, 213 Nation 454, 456 (1971).

[8] Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act, 20 Ad. L. Rev. 263, 264 (1967).

lights favorable news. In this filtering process the secrecy stamp is the officials' tool of suppression and it has been used to withhold information which in "99½%" of the cases would present no danger to national security.[9] To refuse to publish "classified" reports would at times relegate a publisher to distributing only the press releases of Government or remaining silent; if he printed only the press releases or "leaks" he would become an arm of officialdom, not its critic. Rather, in my view, when a publisher obtains a classified document he should be free to print it without fear of retribution, unless it contains material directly bearing on future, sensitive planning of the Government.[10] By that test Beacon Press could with

---

[9] United States Government Information Policies and Practices— The Pentagon Papers, Hearings before a Subcommittee of the House Committee on Government Operations, 92d Cong., 1st Sess., pt. 1, p. 97; Cong. Horton, The Public's Right to Know, 77 Case & Comm. 3, 5 (1972). We are told that the military has withheld as confidential a large selection of photographs showing atrocities against Vietnamese civilians wrought by both Communist and United States forces. Even a training manual devoted to the history of the Bolshevik revolution was dubbed secret by the military. Hearings, *supra*, pt. 3, at 966, 967 (testimony of former classification officer). And ordinary newspaper clippings of criticism aimed at the military have been routinely marked secret. *Id.*, pt. 1, at 100. Former Justice and former Ambassador to the United Nations Arthur Goldberg has stated: "I have read and prepared countless thousands of classified documents. In my experience, 75 percent of these documents should never have been classified in the first place; another 15 percent quickly outlived the need for secrecy; and only about 10 percent genuinely required restricted access over any significant period of time." *Id.*, pt. 1, at 12.

[10] Moreover, I would not even permit a conviction for the publication of documents related to future and sensitive planning where the jury was permitted, as it was in *United States* v. *Drummond*, 354 F. 2d 132, 152 (CA2), to consider the fact that the documents had been classified by the Executive Branch pursuant to its present overbroad system which, in my view, unnecessarily sweeps too much

impunity reproduce the Pentagon Papers inasmuch as their content "is all history, not future events. None of it is more recent than 1968." *New York Times Co.* v. *United States,* 403 U. S., at 722 n. 3 (concurring opinion).

The late Mr. Justice Harlan in the Pentagon Papers case said that in that situation the courts had only two restricted functions to perform: *first,* to ascertain whether the subject matter of the dispute lies within the proper compass of the President's constitutional power; and *second,* to insist that the head of the Executive Department concerned—whether State or Defense—determine if disclosure of the subject matter "would irreparably impair the national security." Beyond those two inquiries, he concluded, the judiciary may not go. *Id.,* at 757–758 (dissenting opinion).

My view is quite different. When the press stands before the court as a suspected criminal, it is the duty of the court to disregard what the prosecution claims is the executive privilege and to acquit the press or overturn the ruling or judgment against it, if the First Amendment and the assertion of the executive privilege conflict. For the executive privilege—nowhere made explicit in the Constitution—is necessarily subordinate to the express commands of the Constitution.

*United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, involved the question whether a proclamation issued by the President, pursuant to a Joint Resolution of the

nonsensitive information into the locked files of the bureaucracies. In general, however, I agree that there may be situations and occasions in which the right to know must yield to other compelling and overriding interests. As Professor Henkin has observed, many deliberations in Government are kept confidential, such as the proceedings of grand juries or our own Conferences, despite the fact that the breadth of public knowledge is thereby diminished. Henkin, The Right To Know And The Duty To Withhold: The Case Of The Pentagon Papers, 120 U. Pa. L. Rev. 271, 274–275 (1971).

Congress, was adequate to sustain an indictment. The Court, in holding that it was, discussed at length the power of the President. The Court said that the power of the President in the field of international relations does not require as a basis an Act of Congress; but it added that his power "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Id.,* at 320.

When the Executive Branch launches a criminal prosecution against the press, it must do so only under an Act of Congress. Yet Congress has no authority to place the press under the restraints of the executive privilege without "abridging" the press within the meaning of the First Amendment.

In related and analogous situations, federal courts have subordinated the executive privilege to the requirements of a fair trial.

Mr. Chief Justice Marshall in the trial of Aaron Burr ruled "[t]hat the president of the United States may be subpoenaed, and examined as a witness, and required to produce any paper in his possession, is not controverted." *United States* v. *Burr,* 25 F. Cas. 187, 191 (No. 14,694) (CC Va. 1807). Yet he "may have sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production." *Ibid.* A letter to the President, he said, "may relate to public concerns" and not be "forced into public view." *Id.,* at 192. But where the paper was shown "to be essential to the justice of the case," *ibid.,* "the paper [should] be produced, or the cause be continued." *Ibid.*

*Jencks* v. *United States,* 353 U. S. 657, is in that tradition. It was a criminal prosecution for perjury, the telling evidence against the accused being the testimony of Government investigators. The defense asked for contemporary notes made by agents at the time. Refusal

was based on their confidential character. We held that to be reversible error.[11]

> "We hold that the criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at the trial. Accord, *Roviaro* v. *United States,* 353 U. S. 53, 60–61. The burden is the Government's, not to be shifted to the trial judge, to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession." *Id.,* at 672.

Congress enacted the so-called Jencks Act, 18 U. S. C. § 3500, regulating the use of Government documents in criminal prosecutions. We sustained that Act. *Scales* v. *United States,* 367 U. S. 203, 258. Under the Act a defendant "on trial in a federal criminal prosecution is entitled, for impeachment purposes, to relevant and

---

[11] In *Alderman* v. *United States,* 394 U. S. 165, we took a like course in requiring the prosecution to disclose to the defense records of unlawful electronic surveillance:

"It may be that the prospect of disclosure will compel the Government to dismiss some prosecutions in deference to national security or third-party interests. But this is a choice the Government concededly faces with respect to material which it has obtained illegally and which it admits, or which a judge would find, is arguably relevant to the evidence offered against the defendant." *Id.,* at 184.

A different rule obtains in civil suits where the government is not the moving party but is a defendant and has specified the terms on which it may be sued. *United States* v. *Reynolds,* 345 U. S. 1, 12.

competent statements of a government witness in possession of the Government touching the events or activities as to which the witness has testified at the trial. . . . The command of the statute is thus designed to further the fair and just administration of criminal justice, a goal of which the judiciary is the special guardian." *Campbell* v. *United States,* 365 U. S. 85, 92. And see *Clancy* v. *United States,* 365 U. S. 312.

The prosecution often dislikes to make public the identity of the informer on whose information its case rests. But his identity must be disclosed where his testimony is material to the trial. *Roviaro* v. *United States,* 353 U. S. 53. In other words, the desire for Government secrecy does not override the demands for a fair trial. And see *Scher* v. *United States,* 305 U. S. 251, 254. The constitutional demands for a fair trial, implicit in the concept of due process, *In re Murchison,* 349 U. S. 133, 136, override the Government's desire for secrecy, whether the identity of an informer or the executive privilege be involved. And see *Smith* v. *Illinois,* 390 U. S. 129.

The requirements of the First Amendment are not of lesser magnitude. They override any claim to executive privilege. As stated in *United States* v. *Curtiss-Wright Corp., supra,* the class of executive privilege "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." 299 U. S., at 320.

## III

Aside from the question of the extent to which publishers can be penalized for printing classified documents, surely the First Amendment protects against all inquiry into the dissemination of information which, although once classified, has become part of the public domain.

To summon Beacon Press through its officials before the grand jury and to inquire into why it did what it did

and its publication plans is "abridging" the freedom of the press contrary to the command of the First Amendment. In light of the fact that these documents were part of the official Senate record,[12] Beacon Press has violated no valid law, and the grand jury's scrutiny of it reduces to "[e]xposure purely for the sake of exposure." *Uphaus* v. *Wyman*, 360 U. S., at 82 (BRENNAN, J., dissenting). As in *United States* v. *Rumely*, 345 U. S. 41, where a legislative committee inquired of a publisher of political tracts as to its customers' identities, "[i]f the present inquiry were sanctioned, the press would be subjected to harassment that in practical effect might be as serious as censorship." *Id.*, at 57 (concurring opinion). Under our Constitution the Government has no surveillance over the press. That includes, as we held in *New York Times Co.* v. *United States*, 403 U. S. 713, the prohibition against prior restraints. Yet criminal punishment for or investigations of what the press publishes, though a different species of abridgment, is nonetheless within the ban of the First Amendment.

The story of the Pentagon Papers is a chronicle of suppression of vital decisions to protect the reputations and political hides of men who worked an amazingly successful scheme of deception on the American people. They were successful not because they were astute but because the press had become a frightened, regimented, submissive instrument, fattening on favors from those in power and forgetting the great tradition of reporting. To allow the press further to be cowed by grand

---

[12] Republication of what has filled the Congressional Record is commonplace. Newspapers, television, and radio use its contents constantly. I see no difference between republication of a paragraph and republication of material amounting to a book. Once a document or a series of documents is in the record of the Senate or House or one of its committees it is in the public domain.

jury inquiries and prosecution is to carry the concept of "abridging" the press to frightening proportions.

What would be permissible if Beacon Press "stole" the Pentagon Papers is irrelevant to today's decision. What Beacon Press plans to publish is matter introduced into a public record by a Senator acting under the full protection of the Speech or Debate Clause.[13] In light of the command of the First Amendment we have no choice but to rule that here government, not the press, is lawless.

I would affirm the judgment of the Court of Appeals except as to Beacon Press, in which case I would reverse.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS, and MR. JUSTICE MARSHALL, join, dissenting.

The facts of this litigation, which are detailed by the Court, and the objections to overclassification of documents by the Executive, detailed by my Brother DOUGLAS, need not be repeated here. My concern is with the narrow scope accorded the Speech or Debate Clause by today's decision. I fully agree with the Court that a Congressman's immunity under the Clause must also be extended to his aides if it is to be at all effective. The complexities and press of congressional business make it impossible for a Member to function without the close cooperation of his legislative assistants. Their role as his agents in the performance of official duties requires that they share his immunity for those acts. The scope of that immunity, however, is as important as the persons to whom it extends. In my view, today's decision so restricts the privilege of speech or debate as to endanger the continued performance of legislative tasks that are vital to the workings of our democratic system.

---

[13] It is conceded that all of the material which Beacon Press has undertaken to publish was introduced into the Subcommittee record and that this record is open to the public. See Brief for United States 3.

# I

In holding that Senator Gravel's alleged arrangement with Beacon Press to publish the Pentagon Papers is not shielded from extra-senatorial inquiry by the Speech or Debate Clause, the Court adopts what for me is a far too narrow view of the legislative function. The Court seems to assume that words spoken in debate or written in congressional reports are protected by the Clause, so that if Senator Gravel had recited part of the Pentagon Papers on the Senate floor or copied them into a Senate report, those acts could not be questioned "in any other Place." Yet because he sought a wider audience, to publicize information deemed relevant to matters pending before his own committee, the Senator suddenly loses his immunity and is exposed to grand jury investigation and possible prosecution for the republication. The explanation for this anomalous result is the Court's belief that "Speech or Debate" encompasses only acts necessary to the internal deliberations of Congress concerning proposed legislation. "Here," according to the Court, "private publication by Senator Gravel through the cooperation of Beacon Press was in no way essential to the deliberations of the Senate." *Ante,* at 625. Therefore, "the Senator's arrangements with Beacon Press were not part and parcel of the legislative process." *Id.,* at 626.

Thus, the Court excludes from the sphere of protected legislative activity a function that I had supposed lay at the heart of our democratic system. I speak, of course, of the legislator's duty to inform the public about matters affecting the administration of government. That this "informing function" falls into the class of things "generally done in a session of the House by one of its members in relation to the business before it," *Kilbourn* v. *Thompson,* 103 U. S. 168, 204 (1881), was explicitly acknowledged by the Court in *Watkins*

v. *United States*, 354 U. S. 178 (1957). In speaking of the "power of the Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government," the Court noted that "[f]rom the earliest times in its history, the Congress has assiduously performed an 'informing function' of this nature." *Id.*, at 200 n. 33.

We need look no further than Congress itself to find evidence supporting the Court's observation in *Watkins*. Congress has provided financial support for communications between its Members and the public, including the franking privilege for letters, telephone and telegraph allowances, stationery allotments, and favorable prices on reprints from the Congressional Record. Congressional hearings, moreover, are not confined to gathering information for internal distribution, but are often widely publicized, sometimes televised, as a means of alerting the electorate to matters of public import and concern. The list is virtually endless, but a small sampling of contemporaneous hearings of this kind would certainly include the Kefauver hearings on organized crime, the 1966 hearings on automobile safety, and the numerous hearings of the Senate Foreign Relations Committee on the origins and conduct of the war in Vietnam. In short, there can be little doubt that informing the electorate is a thing "generally done" by the Members of Congress "in relation to the business before it."

The informing function has been cited by numerous students of American politics, both within and without the Government, as among the most important responsibilities of legislative office. Woodrow Wilson, for example, emphasized its role in preserving the separation of powers by ensuring that the administration of public policy by the Executive is understood by the legislature and electorate:

> "It is the proper duty of a representative body to look diligently into every affair of government

and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct." Congressional Government 303 (1885).

Others have viewed the give-and-take of such communication as an important means of educating both the legislator and his constituents:

"With the decline of Congress as an original source of legislation, this function of keeping the government in touch with public opinion and of keeping public opinion in touch with the conduct of the government becomes increasingly important. Congress no longer governs the country; the Administration in all its ramifications actually governs. But Congress serves as a forum through which public opinion can be expressed, general policy discussed, and the conduct of governmental affairs exposed and criticized." The Reorganization of Congress, A Report of the Committee on Congress of the American Political Science Association 14 (1945).

Though I fully share these and related views on the educational values served by the informing function, there is yet another, and perhaps more fundamental, interest at stake. It requires no citation of authority to state that public concern over current issues—the war, race relations, governmental invasions of privacy—

has transformed itself in recent years into what many believe is a crisis of confidence, in our system of government and its capacity to meet the needs and reflect the wants of the American people. Communication between Congress and the electorate tends to alleviate that doubt by exposing and clarifying the workings of the political system, the policies underlying new laws and the role of the Executive in their administration. To the extent that the informing function succeeds in fostering public faith in the responsiveness of Government, it is not only an "ordinary" task of the legislator but one that is essential to the continued vitality of our democratic institutions.

Unlike the Court, therefore, I think that the activities of Congressmen in communicating with the public are legislative acts protected by the Speech or Debate Clause. I agree with the Court that not every task performed by a legislator is privileged; intervention before Executive departments is one that is not. But the informing function carries a far more persuasive claim to the protections of the Clause. It has been recognized by this Court as something "generally done" by Congressmen, the Congress itself has established special concessions designed to lower the cost of such communication, and, most important, the function furthers several well-recognized goals of representative government. To say in the face of these facts that the informing function is not privileged merely because it is not necessary to the internal deliberations of Congress is to give the Speech or Debate Clause an artificial and narrow reading unsupported by reason.

Nor can it be supported by history. There is substantial evidence that the Framers intended the Speech or Debate Clause to cover all communications from a Congressman to his constituents. Thomas Jefferson clearly expressed that view of legislative privilege in a

case involving Samuel Cabell, Congressman from Virginia. In 1797 a federal grand jury in Virginia investigated the conduct of several Congressmen, including Cabell, in sending newsletters to constituents critical of the administration's policy in the war with France. The grand jury found that the Congressmen had endeavored "at a time of real public danger, to disseminate unfounded calumnies against the happy government of the United States, and thereby to separate the people therefrom; and to increase or produce a foreign influence, ruinous to the peace, happiness, and independence of these United States." Jefferson immediately drafted a long essay signed by himself and several citizens of Cabell's district, condemning the grand jury investigation as a blatant violation of the congressional privilege. Revised and joined by James Madison, the protest was forwarded to the Virginia House of Delegates. It reads in part as follows:

> "[T]hat in order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was a part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the co-ordinate branches, Judiciary and Executive; and that their communications with their constituents should of right, as of duty also, be free, full, and unawed by any: that so necessary has this intercourse been deemed in the country from which they derive principally their descent and laws, that the correspondence between the representative and constituent is privileged there to pass free of expense through the channel of the public post, and that the proceedings of the legislature have been known to be arrested and suspended at times until the Representa-

tives could go home to their several counties and confer with their constituents.

.           .           .           .           .

"That when circumstances required that the ancient confederation of this with the sister States, for the government of their common concerns, should be improved into a more regular and effective form of general government, the same representative principle was preserved in the new legislature, one branch of which was to be chosen directly by the citizens of each State, and the laws and principles remained unaltered which privileged the representative functions, whether to be exercised in the State or General Government, against the cognizance and notice of the co-ordinate branches, Executive and Judiciary; and for its safe and convenient exercise, the intercommunication of the representative and constituent has been sanctioned and provided for through the channel of the public post, at the public expense.

.           .           .           .           .

"That the grand jury is a part of the Judiciary, not permanent indeed, but in office, *pro hac vice* and responsible as other judges are for their actings and doings while in office: that for the Judiciary to interpose in the legislative department between the constituent and his representative, to control them in the exercise of their functions or duties towards each other, to overawe the free correspondence which exists and ought to exist between them, to dictate what communications may pass between them, and to punish all others, to put the representative into jeopardy of criminal prosecution, of vexation, expense, and punishment before the Judiciary, if his communications, public or private, do not exactly square with their ideas of fact or right, or with their designs of wrong, is to put the legislative de-

partment under the feet of the Judiciary, is to leave us, indeed, the shadow, but to take away the substance of representation, which requires essentially that the representative be as free as his constituents would be, that the same interchange of sentiment be lawful between him and them as would be lawful among themselves were they in the personal transaction of their own business; is to do away the influence of the people over the proceedings of their representatives by excluding from their knowledge, by the terror of punishment, all but such information or misinformation as may suit their own views; and is the more vitally dangerous when it is considered that grand jurors are selected by officers nominated and holding their places at the will of the Executive . . . ; and finally, is to give to the Judiciary, and through them to the Executive, a complete preponderance over the legislature rendering ineffectual that wise and cautious distribution of powers made by the constitution between the three branches, and subordinating to the other two that branch which most immediately depends on the people themselves, and is responsible to them at short periods." 8 The Works of Thomas Jefferson 322–327 (Ford ed. 1904).

Jefferson's protest is perhaps the most significant and certainly the most cogent analysis of the privileged nature of communication between Congressman and public. Its comments on the history, purpose, and scope of the Clause leave no room for the notion that the Executive or Judiciary can in any way question the contents of that dialogue. Nor was Jefferson alone among the Framers in that view. Aside from Madison, who joined in the protest, James Wilson took the position that a member of Congress "should enjoy the fullest liberty of speech, and . . . should be protected from

the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence." 1 Works of James Wilson 421 (R. McCloskey ed. 1967). Wilson, a member of the Committee responsible for drafting the Speech or Debate Clause, stated in plainest terms his belief in the duty of Congressmen to inform the people about proceedings in the Congress:

> "That the conduct and proceedings of representatives should be as open as possible to the inspection of those whom they represent, seems to be, in republican government, a maxim, of whose truth or importance the smallest doubt cannot be entertained. That, by a necessary consequence, every measure, which will facilitate or secure this open communication of the exercise of delegated power, should be adopted and patronised by the constitution and laws of every free state, seems to be another maxim, which is the unavoidable result of the former." *Id.*, at 422.

Wilson's statements, like those of Jefferson and Madison, reflect a deep conviction of the Framers, that self-government can succeed only when the people are informed by their representatives, without interference by the Executive or Judiciary, concerning the conduct of their agents in government. That conviction is no less valid today than it was at the time of our founding. I would honor the clear intent of the Framers and extend to the informing function the protections embodied in the Speech or Debate Clause.

The Court, however, offers not a shred of evidence concerning the Framers' intent, but relies instead on the English view of legislative privilege to support its interpretation of the Clause. Like the Court itself, *ante,* at 623–624, n. 14, I have some doubt concerning the relevance of English authority to this case, particularly authority post-dating the adoption of our Constitution. But

in any event it is plain that the Court has misread the history on which it relies. The Speech or Debate Clause of the English Bill of Rights was at least in part the product of a struggle between Parliament and Crown over the very type of activity involved in this litigation. During the reign of Charles II, the House of Commons received a number of reports about an alleged plot between the Crown and the King of France to restore Catholicism as the established religion of England. The most famous of these reports, Dangerfield's Narrative, was entered into the Commons Journal and then republished by order of the Speaker of the House, Sir William Williams, with the consent of Commons. In 1686, after James II came to the throne, informations charging libel were filed against Williams in King's Bench. Despite the arguments of his attorney, Sir Robert Atkyns, that the publication was necessary to the "counselling" and "enquiring" functions of Parliament, Williams' plea of privilege was rejected and he was fined £10,000. Shortly after Williams' conviction James II was sent into exile, and a committee was appointed by the House of Commons to report upon "such things as are absolutely necessary for securing the Laws and Liberties of the Nation." 9 Debates of the House of Commons, coll. by A. Grey, 1763, p. 37. In reporting to the House, the chairman of the committee stated that the provision for freedom of speech and debate was included "for the sake of one . . . Sir William Williams, who was punished out of Parliament for what he had done in Parliament." *Id.*, at 81. Following consultation with the House of Lords, that provision was included as part of the English Bill of Rights, and the judgment against Williams was declared by Commons "illegal and subversive of the freedom of parliament." 1 W. Townsend, Memoirs of the House of Commons 414 (2d ed. 1844).

Although the origins of the Speech or Debate Clause in

England can thus be traced to a case involving republication, the Court, citing *Stockdale* v. *Hansard*, 9 Ad. & E. 1, 112 Eng. Rep. 1112 (K. B. 1839), says that "English legislative privilege was not viewed as protecting republication of an otherwise immune libel on the floor of the House." *Ante*, at 622. That conclusion reflects an erroneous reading of precedent. *Stockdale* did state that "if the calumnious or inflammatory speeches should be reported and published, the law will attach responsibility on the publisher." *Id.*, at 114, 112 Eng. Rep., at 1156. But *Stockdale* concerned only the publisher's liability, not that of a member of Parliament; thus, it has little bearing on the instant case. Furthermore, contrary to the Court's assertion, *ante*, at 623–624, n. 14, even the narrow result of *Stockdale* was repudiated 30 years later in *Wason* v. *Walter*, L. R. 4 Q. B. 73 (1868), for reasons strikingly similar to those expressed by Jefferson in his protest.[1] In

---

[1] In *Wason* the proprietor of the London Times was sued for printing an account of a libelous debate in the House of Lords. The court agreed with *Stockdale* that the House did not have final authority to determine the scope of its privileges and thus could not confer immunity on any publisher merely by ordering a document printed and then declaring it privileged. Indeed, the *Wason* court gave its "unhesitating and unqualified adhesion" to *Stockdale* on that point. *Id.*, at 86. The only issue for the court, therefore, was whether the publication "is, independently of such order or assertion of privilege, in itself privileged and lawful." *Id.*, at 87. On that issue the court severely criticized the reasoning of earlier cases, including *Stockdale*, stating that two of the Justices in that case had expressed a "very shortsighted view of the subject." *Id.*, at 91. The court held that so long as the republication was accurate and in good faith, it could not be the basis of a libel action; and the member himself was privileged to publish his speech "for the information of his constituents." *Id.*, at 95. Relying, not on the Parliamentary Papers Act of 1840, which was enacted in response to *Stockdale*, but on the analogy to judicial reports and the need for an informed public, the court stated:

"It seems to us impossible to doubt that it is of paramount public and national importance that the proceedings of the houses of par-

my view, therefore, the English precedent, if relevant at all, supports Senator Gravel's position here.

Thus, from the standpoint of function or history, it is plain that Senator Gravel's dissemination of material,

liament shall be communicated to the public, who have the deepest interest in knowing what passes within their walls, seeing that on what is there said and done, the welfare of the community depends. Where would be our confidence in the government of the country or in the legislature by which our laws are framed, and to whose charge the great interests of the country are committed,—where would be our attachment to the constitution under which we live,—if the proceedings of the great council of the realm were shrouded in secrecy and concealed from the knowledge of the nation? How could the communications between the representatives of the people and their constituents, which are so essential to the working of the representative system, be usefully carried on, if the constituencies were kept in ignorance of what their representatives are doing? What would become of the right of petitioning on all measures pending in parliament, the undoubted right of the subject, if the people are to be kept in ignorance of what is passing in either house? Can any man bring himself to doubt that the publicity given in modern times to what passes in parliament is essential to the maintenance of the relations subsisting between the government, the legislature, and the country at large?" *Id.,* at 89.

The fact that the debate was published in violation of a standing order of Parliament was held to be irrelevant. "Independently of the orders of the houses, there is nothing unlawful in publishing reports of parliamentary proceedings. . . . [A]ny publication of its debates made in contravention of its orders would be a matter between the house and the publisher." *Id.,* at 95.

Whether *Wason* was based on parliamentary privilege or on an analogy to the publication of judicial proceedings is unimportant. What is important to the instant litigation is that *Wason* firmly rejected any implication in *Stockdale* that the informing function was not among the legislative activities that a member of Parliament was privileged to perform. Indeed, that same conclusion was reached by Sir Gilbert Campion, a noted scholar, in his memorandum to the House of Commons' Select Committee on the Official Secrets Acts. After reviewing the republication cases through *Wason,* the memorandum concluded:

"If . . . a member circulated among his constituents a speech made

placed by him in the record of a congressional hearing, is itself legislative activity protected by the privilege of speech or debate. Whether or not that privilege protects the publisher from prosecution or the Senator from senatorial discipline, it certainly shields the Senator from any grand jury inquiry about his part in the publication. As we held in *United States* v. *Johnson,* 383 U. S. 169 (1966), neither a Congressman, nor his aides, nor third parties may be made to testify concerning privileged acts or their motives. That immunity, which protects legislators "from deterrents to the uninhibited discharge of their legislative duty," *Tenney* v. *Brandhove,* 341 U. S. 367, 377 (1951), is the essence of the Clause, designed not for the legislators' "private indulgence but for the public good." *Id.,* at 377.

That privilege, moreover, may not be defeated merely because a court finds that the publication was irregular or the material irrelevant to legislative business. Legislative immunity secures "to every member exemption from prosecution, for every thing said or done by him, as a representative, in the exercise of the functions of that office . . . whether the exercise was regular according to the rules of the house, or irregular and against their rules." *Coffin* v. *Coffin,* 4 Mass. 1, 27 (1808). Thus, if the republication of this committee record was unauthorized or even prohibited by the Senate rules, it

by him in Parliament in which he had disclosed information [otherwise subject to the Official Secrets Acts], it might be held on the analogy of the principles which have been said to apply to prosecutions for libel that he could not be proceeded against for disclosing it to his constituents, unless, of course, the speech had been made in a secret session. Even if the suggested analogy is not admitted, it would be repugnant to common sense to hold that though the original disclosure in the House was protected by parliamentary privilege, the circulation of the speech among the member's constituents was not." Minutes of Evidence Taken before the Select Committee on the Official Secrets Acts 29 (1939).

is up to the Senate, not the Executive or Judiciary, to fashion the appropriate sanction to discipline Senator Gravel.

Similarly, the Government cannot strip Senator Gravel of the immunity by asserting that his conduct "did not relate to any pending Congressional business." Brief for United States 41. The Senator has stated that his hearing on the Pentagon Papers had a direct bearing on the work of his Subcommittee on Buildings and Grounds, because of the effect of the Vietnam war on the domestic economy and the lack of sufficient federal funds to provide adequate public facilities. If in fact the Senator is wrong in this contention, and his conduct at the hearing exceeded the subcommittee's jurisdiction, then again it is the Senate that must call him to task. This Court has permitted congressional witnesses to defend their refusal to answer questions on the ground of nongermaneness. *Watkins* v. *United States,* 354 U. S. 178 (1957). Here, however, it is the Executive that seeks the aid of the judiciary, not to protect individual rights, but to extend its power of inquiry and interrogation into the privileged domain of the legislature. In my view the Court should refuse to turn the freedom of speech or debate on the Government's notions of legislative propriety and relevance. We would weaken the very structure of our constitutional system by becoming a partner in this assault on the separation of powers.

Whether the Speech or Debate Clause extends to the informing function is an issue whose importance goes beyond the fate of a single Senator or Congressman. What is at stake is the right of an elected representative to inform, and the public to be informed, about matters relating directly to the workings of our Government. The dialogue between Congress and people has been recognized, from the days of our founding, as one of the necessary elements of a representative system.

We should not retreat from that view merely because, in the course of that dialogue, information may be revealed that is embarrassing to the other branches of government or violates their notions of necessary secrecy. A Member of Congress who exceeds the bounds of propriety in performing this official task may be called to answer by the other Members of his chamber. We do violence to the fundamental concepts of privilege, however, when we subject that same conduct to judicial scrutiny at the instance of the Executive.[2] The threat of "prosecution by an unfriendly executive and conviction by a hostile judiciary," *United States* v. *Johnson,* 383 U. S., at 179, that the Clause was designed to avoid, can only lead to timidity in the performance of this vital function. The Nation as a whole benefits from the congressional investigation and exposure of official corruption and deceit. It likewise suffers when that exposure is replaced by muted criticism, carefully hushed behind congressional walls.

## II

Equally troubling in today's decision is the Court's refusal to bar grand jury inquiry into the source of documents received by the Senator and placed by him in the hearing record. The receipt of materials for use in a congressional hearing is an integral part of the preparation for that legislative act. In *United States* v. *Johnson, supra,* the Court acknowledged the privileged nature of such preparatory steps, holding that they, like the act itself and its motives, must be shielded from scrutiny by the Executive and Judiciary. That holding merely recognized the obvious—that speeches,

---

[2] Different considerations may apply, of course, where the republication is attacked, not by the Executive, but by private persons seeking judicial redress for an alleged invasion of their constitutional rights.

hearings, and the casting of votes require study and planning in advance. It would accomplish little toward the goal of legislative freedom to exempt an official act from intimidating scrutiny, if other conduct leading up to the act and intimately related to it could be deterred by a similar threat. The reasoning that guided that Court in *Johnson* is no less persuasive today, and I see no basis, nor does the Court offer any, for departing from it here. I would hold that Senator Gravel's receipt of the Pentagon Papers, including the name of the person from whom he received them, may not be the subject of inquiry by the grand jury.

I would go further, however, and also exclude from grand jury inquiry any knowledge that the Senator or his aides might have concerning how the source himself first came to possess the Papers. This immunity, it seems to me, is essential to the performance of the informing function. Corrupt and deceitful officers of government do not often post for public examination the evidence of their own misdeeds. That evidence must be ferreted out, and often is, by fellow employees and subordinates. Their willingness to reveal that information and spark congressional inquiry may well depend on assurances from their contact in Congress that their identities and means of obtaining the evidence will be held in strictest confidence. To permit the grand jury to frustrate that expectation through an inquiry of the Congressman and his aides can only dampen the flow of information to the Congress and thus to the American people. There is a similar risk, of course, when the Member's own House requires him to break the confidence. But the danger, it seems to me, is far less if the Member's colleagues, and not an "unfriendly executive" or "hostile judiciary," are charged with evaluating the propriety of his conduct. In any event, assuming that a Congressman can be required to reveal the

sources of his information and the methods used to obtain that information, that power of inquiry, as required by the Clause, is that of the Congressman's House, and of that House only.

I respectfully dissent.