August 31, 1978

## 78-96 MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

### General Accounting Office—Authority to Obtain Information in Possession of Executive Branch— Constitutional Law—President—Confidential Communications—Appointments

I am responding to your deputy's memorandum of July 27, 1978, asking for our advice with respect to two requests for information, each dated July 27, 1978, received from an official in the General Accounting Office (GAO). One, addressed to your deputy, relates to appointments to the United States Metric Board; the other, addressed to the Chairman of the Council of Economic Advisers (CEA), relates to data and memoranda connected with last winter's coal strike. We note that the requests were not signed by the Comptroller General but by a subordinate GAO official.

We conclude that the Comptroller General lacks authority to obtain the information sought.

I.

The request addressed to the Chairman of the CEA states that it is made in connection with an evaluation of the Administration's estimate of unemployment due to last winter's coal strike, which evaluation is being conducted by the GAO at the request of the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce. The GAO asks specifically for the following data:

A description of the computer model developed by CEA to measure the unemployment impact of the coal strike including (1) assumptions used, (2) variables used, and (3) any limitations of the model.

Memoranda from CEA to the White House and/or DOE concerning the computer model output on unemployment estimates and any comments, suggestions, or recommendations by CEA as to which estimate to use for policy decisions.

The request thus has three elements: A computer model, memoranda to the White House, and memoranda from CEA to the Department of Energy. We have been informed by the CEA that the computer model was developed for the following purposes: Advice to the President and preparation of an affidavit by the Chairman of the CEA to be used in connection with the Taft-Hartley proceedings during last winter's coal strike. We also have been advised that the memoranda from CEA to the White House and from CEA to the Secretary of Energy also dealt with the preparation of the computer model and with advice to the President.

Our analysis proceeds from what we believe are now well-accepted basic premises. First, the Comptroller General is an officer of the Legislative branch. He has long been so viewed by Congress and by the Executive branch. *See, e.g.,* Corwin, *Tenure of Office and the Removal Power,* 27 Colum. L. Rev. 354, 396 (1927); Willoughby, *The Legal Status and Functions of the General Accounting Office,* 12-16 (1927). *See also* Reorganization Act of 1949, Ch. 226., 63 Stat. 205; Reorganization Act of 1945, Ch. 582., 59 Stat. 616. His functions derive from and must be based upon the performance of appropriate congressional functions. Second, confidential Executive branch communications are presumptively privileged. *See, United States* v. *Nixon,* 418 U.S. 683 (1974); *Nixon* v. *G.S.A.,* 433 U.S. 425 (1977). We think it clear that this privilege, in order to be meaningful, must extend beyond the President personally to those who serve under and advise him. Thus, confidential communications between close Presidential advisers also fall within the "presumptive privilege" identified by the Supreme Court. *See, Nixon, supra,* at 682 ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions . . . ."); *Nixon* v. *Administrator,* 433 U.S. 446, n. 10 (acknowledging the "legitimate governmental interest in the confidentiality of communications between high government officials, *e.g.,* those who advise the President"); *Nixon* v. *Sampson,* 389 F. Supp. 107, 150 n. 112 (D.D.C. 1975).

This conclusion is based on the same practical considerations that led the Supreme Court in *Gravel* v. *United States,* 408 U.S. 606, 617 (1972), to conclude that a Senator's legislative side is entitled to the protections afforded by the Speech and Debate Clause.

Third, it must also be acknowledged that, unlike the privilege governing sensitive military, diplomatic, and foreign affairs matters, the presumptive privilege for confidential communications is not absolute. Congress has constitutional functions which it must carry out, and where collisions occur between its exercise of those functions and the Executive branch's need to preserve confidentiality, a careful weighing of the respective interests must be undertaken. *Nixon* v. *G.S.A., supra; United States* v. *A.T. & T. Co.,* 567 F. (2d) 121 (D.C. Cir. 1977), *Senate Select Committee on Presidential Campaign Activities* v. *Nixon,* 498 F. (2d) 725 (D.C. Cir. 1974). As stated in the most recent decision by the D.C. Circuit Court of Appeals, where genuine and substantial competing interests are raised there is "an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation

of the needs of the conflicting branches in the particular fact situation." *United States* v. *A.T. & T. Co.,* 567 F. (2d) at 127.

With these basic considerations in mind the Comptroller General's subordinate's request can be analyzed. First, it would appear that the three sorts of documents requested fall within the presumptive constitutional privilege and, therefore, a decision not to disclose the requested documents might be properly based on the determination that disclosure here would interfere with necessary relationships of confidentiality. For the reasons stated above, we think that such a decision can extend not only to the direct communications between the Chairman of CEA and the President but also to the communications between the Chairman and the Secretary of Energy and to the computer workup done in order to assist the Chairman in providing advice to the President.

Before finally arriving at that conclusion, however, we think attention should be given to the Comptroller General's subordinate's reasons for seeking the material and the authority upon which that request is based.

In response to an inquiry from your deputy, the General Counsel of the General Accounting Office stated in a letter dated August 11, 1978, that GAO's "right to access to the records" in question stems from 31 U.S.C. § 54 (1976). This statute, which is GAO's basic provision with respect to its authority to seek documents, derives from § 313 of the Budget and Accounting Act of 1921, Ch. 18, 42 Stat. 26, and reads as follows:

> § 313. All departments and establishments shall furnish to the Comptroller General such information regarding the powers, duties, activities, organization, financial transactions, and methods of business of their respective offices as he may from time to time require of them; and the Comptroller General, or any of his assistants or employees, when duly authorized by him, shall, for the purpose of securing such information, have access to and the right to examine any books, documents, papers, or records of any such department or establishment. The authority contained in this section shall not be applicable to expenditures made under the provisions of section 291 of the Revised Statutes [31 U.S.C. § 107 (1976)].

As a matter of normal statutory construction we doubt whether this provision provides a foundation for the request made in this instance. By its terms, § 313 directs "all departments and establishments"[1] to comply with requests from the Comptroller General for information concerning the "powers, duties, activities, organization, financial transactions and methods of business of the respective offices." Because the information in question here plainly does not relate to the powers, duties, organization, financial transactions and methods of business of the CEA, this provision can only apply if the term "activities" is given its very broadest meaning.

---

[1]In view of the broad definition of the term "departments and establishments" in § 2 of the Budget and Accounting Act (31 U.S.C. § 2 (1976)), we assume *arguendo* that the term includes the Executive Office of the President, in which the CEA is located, and the White House Office.

The very breadth of that term suggests the application of the *ajusdem generis* rule of statutory construction to ascertain its import. Since the other terms of the section refer to organizational and fiscal matters, we can properly regard the work "activities" as relating to activities of that nature. That view is supported by the fact that § 313 was enacted at a time when the Comptroller General's functions were limited to those areas. The information sought here does not relate to fiscal or organizational matters; we therefore question whether the request can be based directly on § 313.

Although the most recent letter from the General Counsel of GAO does not explicitly so state, the Comptroller General himself has heretofore taken the position that § 313 does not constitute an independent source of investigatory power. Instead, that section has been cited as an aid in carrying out powers and responsibilities elsewhere conferred on the Comptroller General. In other words, if some statute directs the Comptroller General to investigate, review or evaluate, § 313 has the function of enabling him to obtain information from the Executive branch. In the words of Comptroller General Staats, § 313 is of a "supportive" nature.[2]

While we have not been directed by the General Counsel to any other applicable provision, § 204(a) of the Legislative Reorganization Act of 1970, as amended, is the only statute of which we are aware that could serve as a basis for this request. That section directs the Comptroller General "to review and evaluate the results of government programs and activities carried on under existing laws." Pub. L. 93-344, 88 Stat. 326 (1974). When the section was originally enacted in 1970 it was limited to fiscal and budgetary matters. Pub. L. 91-510, 84 Stat. 1140 (1970), H. Rept. 91-1215, p. 80. While certain amendments in 1974 made only minor changes in the wording of § 204(a), the relevant conference report discloses a congressional purpose to expand its scope so as to enable Congress to utilize the facilities of GAO in connection with its legislative oversight functions.[3]

---

[2]Memorandum submitted by the Comptroller General in Defense Production Act Amendments, Hearings before the Subcommittee on Production and Stabilization of the Committee on Banking, Housing and Urban Affairs, U.S. Senate, 92d Cong., 2d sess., on S. 669 and 1901, pp. 51, 53. *See also* in this connection Morgan, The General Accounting Office, 51 North Carolina Law Review 1279, 1352-1353 (1973).

[3]The pertinent portion of the Conference Report on the Congressional Budget Act of 1974, S. Rept. 93-924, p. 72, reads:
SECTION 702. REVIEW AND EVALUATION BY COMPTROLLER GENERAL.
    The Senate amendment expanded the review and evaluation functions and duties of the Comptroller General, including assistance to committees and Members.
    The conference substitute is a revision of the Senate provision. It amends section 204 of the 1970 Legislative Reorganization Act to expand GAO assistance to Congress. As amended, section 204(a) provides that the Comptroller General shall evaluate Government programs at his own initiative, when ordered by either House, or at the request of a congressional committee. Section 204(b) provides that upon request, the Comptroller General shall assist committees in developing statements of legislative objectives and methods for assessing program performance. The managers consider oversight of executive performance to be among the principal functions of congressional committees and they recognize that the usefulness of program evaluation can be

(Continued)

The request for information concerning the computer model may come within the scope of § 204(a) if it can fairly be said to relate to some legislative oversight of the manner in which programs and activities of the CEA are carried on under existing law. The only substantive piece of legislation involved in the Chairman's activities here was the preparation of an affidavit under the Taft-Hartley Act. It should first be noted that this activity is not among the statutory functions imposed on CEA under § 4(c) of the Employment Act of 1946. Ch. 33, 60 Stat. 23, 15 U.S.C. § 1023(c) (1976). To the contrary, when the Chairman of CEA prepared and executed the affidavit, he was not administering a program subject to legislative oversight but was acting in his capacity as an adviser and assistant to the President.

Assuming *arguendo* that the preparation and execution of a Taft-Hartley affidavit by the Chairman of the CEA might come within the scope of § 204(a) in connection with the exercise of legislative oversight of the manner in which the Taft-Hartley Act is administered, the fact is that it appears from the request that the House Subcommittee on Energy and Power is not engaged in legislative oversight with respect to Taft-Hartley and does not appear to have jurisdiction over that program or activity. Hence, § 204(a) would not appear to constitute an authority for the review and evaluation by the Comptroller General of the manner in which the Taft-Hartley Act is administered.

We presume, although it is not entirely clear, that it might be claimed that this investigation is addressed to the more general question whether there is in existence adequate legislation to avert energy shortage crises in the future.[4] If this is GAO's interest, it is not clear to us how the information requested should prove relevant to that inquiry. We believe that in order to make the kind of "accommodation" suggested by the District of Columbia Circuit Court of Appeals, you would want to know a good deal more about the reasons why this particular information is being requested. Ordinarily, the examination of a single historical incident would not serve as a very useful aid in evaluating the need for legislation. Moreover, to the extent that the examination of a particular episode is deemed important, we would think that the relevant factual details could be gathered without requiring the disclosure of this kind of confidential information.

In summary, it appears to us that there is a substantial basis upon which a decision might be made not to share this information with the Comptroller General's staff. From the information given us by GAO we cannot readily ascertain the authority underlying the request. Nor can we assess the relevance or importance of the information sought. We suspect, however, that a more detailed factual inquiry would likely demonstrate that the interest in preserving

(Continued)
  enhanced by the clear expression of legislative objectives and the employment of modern analytic methods. The managers further believe that statements of intent can be most appropriately developed by the committee of jurisdiction. Members must be provided upon request with all related information after its release by the committee for which it was compiled.

[4] There is a suggestion to this effect in the letter to Chairman Schultze dated July 27, 1978.

the confidentiality of Executive branch communications would exceed the interest GAO might identify in support of its request.

## II.

The second request, addressed to your deputy, asks for detailed information as to whether recent Presidential appointments to the U.S. Metric Board complied with the specific qualification requirements of 15 U.S.C. § 205d (1976). This request, also signed by a subordinate GAO official, was made at the request of an individual member of Congress.

It is our view that compliance with this request is not required. Since the information sought does not involve fiscal matters, the Comptroller General's authority must be based on § 204(a). *See supra.* A request for information under that section, however, presupposes action by either House of Congress or by a committee having jurisdiction over the program or activity under review or evaluation; a request of a single member does not authorize the Comptroller General to proceed.[5]

Beyond that, the request for information may well be outside the jurisdiction of the Comptroller General as an arm of Congress. Under the Constitution, Article II, § 2, the power of appointment of the members of the Board is vested in the President and the Senate, and not in Congress as a whole. Hence, it is the responsibility of the President and Senate to determine whether there has been compliance with the qualification requirements of 15 U.S.C. § 205(d) (1976). As James Madison said during the First Session of the First Congress during the Great Debate concerning the removal power of the President:

> The Legislature creates the Office, defines the powers, limits its duration and annexes a compensation. This done the Legislative power ceases.[6]

Moreover, the appointment of officers of the United States by the President by and with the advice of the Senate does not constitute a Government program or activity carried out under existing law as required by § 204(a).

Finally, it should be noted that there is considerable question whether Congress has the power under the Appointments Clause significantly to restrict the President's discretion in fulfilling his duty to nominate officers of the United States. *See, Buckley* v. *Valeo,* 424 U.S. 1 (1976). The process whereby the President is restricted in naming members to the Board would raise serious questions if the President were therefore deprived of discretion in performing his nominating function. 40 Op. A. G. 551 (1947); 13 Op. A. G. 516, 525

---

[5]Section 204(a), it is true, enables the Comptroller General to proceed on his own initiative. However, it cannot be anticipated that the Comptroller General will take that step after having received the request of a single Congressman, since such a step could have the effect of jeopardizing his "role as an independent nonpolitical agency of the legislative branch." *See also* Mansfield, The Comptroller General, 258; Morgan, The General Accounting Office, *supra,* at 1299-1300.

[6]ANNALS of CONGRESS, First Congress, First Session, Col. 582.

(1871); *cf., Myers* v. *United States,* 272 U.S. 52, 121 (1926). We would have an even greater concern if it were concluded that those who submit names of qualified applicants could not be assured that the names remain confidential. The President might well conclude that in order adequately to fulfill his nominating responsibility he must have candid and straightforward advice from those who submit the names. If the President were so to conclude we think his decision not to disclose would be justified both on the ground that confidentiality is essential to the Appointments Clause process and on a more generalized presumptive constitutional privilege.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*