# Enforcement of INA Employer Sanctions Provisions Against Federal Government Entities

Section 274A of the Immigration and Nationality Act, which establishes employer verification require-
ments and authorizes the Immigration and Naturalization Service to take enforcement actions
against employers for failure to comply with those requirements, authorizes imposition of employer
sanctions against federal government entities.

The INS can exercise this enforcement authority against persons and entities within all three branches
of the federal government in a manner consistent with the Constitution.

March 15, 2000

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
IMMIGRATION AND NATURALIZATION SERVICE

You have requested our advice as to whether section 274A of the Immigration
and Nationality Act ("INA"), which establishes employer verification require-
ments and authorizes the Immigration and Naturalization Service ("INS") to take
enforcement action against employers for failure to comply with those require-
ments, can be applied to federal government entities, in light of the possible con-
stitutional concerns that such enforcement action might raise. As we explain more
fully below, we believe that section 274A clearly contemplates the imposition
of employer sanctions against federal government entities. Moreover, with respect
to employers within all three branches, we conclude that the INS can exercise
its authority to take enforcement actions against such persons or entities consistent
with the Constitution.

## BACKGROUND

Section 274A of the INA provides for the assessment of civil monetary penalties
and cease and desist orders against any "person or other entity" who has know-
ingly hired, or knowingly continued to employ, any unauthorized alien or who
has failed to comply with the employment verification system mandated by section
274A(b).[1] 8 U.S.C. §§ 1324a(e)(4)–(e)(5) (1994 & Supp. II 1996). As used in
section 274A, the term "entity" includes "an entity in any branch of the Federal
Government." *Id.* § 1324a(a)(7).

The INS has the authority to investigate complaints of potential violations of
section 274A by inspecting employment eligibility verification forms maintained
by employers and compelling the production of evidence or the attendance of
witnesses by subpoena. *Id.* § 1324a(e)(2). If, based upon such an investigation,
the INS determines that an employer has violated section 274A, it serves a Notice

---

[1] Criminal penalties and injunctive relief may also be imposed against persons or entities engaged in a "pattern
or practice of violations" of section 274A. *See* 8 U.S.C. § 1324a(f)(1)–(2)

33

of Intent to Fine ("NIF") on the employer. 8 C.F.R. § 274a.9 (1998). An employer served with a NIF may request an evidentiary hearing before an Administrative Law Judge ("ALJ"). 8 U.S.C. § 1324a(e)(3). If the employer does not request a hearing, the NIF becomes a final, unappealable order, *id.*; if a hearing is requested, the ALJ's subsequent decision and order become the final decision and order of the Attorney General, unless a reviewing official or the Attorney General herself modifies or vacates the order, pursuant to regulations. *See id.* § 1324a(e)(7).

Section 274A also provides for judicial review and judicial enforcement of final orders. Under section 274A(e)(8), "[a] person or entity adversely affected by a final order respecting an assessment may, within 45 days after the date the final order is issued, file a petition in the Court of Appeals for the appropriate circuit for review of the order." 8 U.S.C. § 1324a(e)(8). If a person or entity refuses to comply with any final order, the statute provides that "the Attorney General shall file a suit to seek compliance with the order in any appropriate district court of the United States." *Id.* § 1324a(e)(9).

## DISCUSSION

As noted above, section 274A authorizes the INS to assess civil monetary penalties against any "person or other entity" that violates the employment verification provisions of that section. Section 274A(a)(7) provides: "For purposes of this section, the term 'entity' includes an entity in any branch of the Federal Government." 8 U.S.C. § 1324a(a)(7).

We must first determine whether Congress intended to authorize the INS to assess administrative penalties and otherwise bring enforcement proceedings against governmental employers. A straightforward reading of the statutory text leads us to conclude that that was clearly Congress's intent. Prior to passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, section 274A contained no provision defining the scope of the term "entity." In fact, this Office determined in 1992 that the absence at that time of any definition of the phrase "person or other entity" from the INA, together with the lack of evidence that Congress intended the phrase to include federal agencies, precluded application of the term "entity" to a federal government agency in the context of the employer anti-discrimination provision of section 274B. *See Enforcement Jurisdiction of the Special Counsel for Immigration Related Unfair Employment Practices*, 16 Op. O.L.C. 121, 123–24 (1992).

In 1996, Congress amended section 274A to make clear that the term "entity" did apply to federal government entities. Section 412(d) of IIRIRA added new subparagraph 274A(a)(7) to the INA:

"Application to Federal Government — For purposes of this section, the term 'entity' includes an entity in any branch of the Federal Government."

8 U.S.C. § 1324a(a)(7). We believe the language of that provision is manifest: for purposes of section 274A, the term "entity" applies to all federal government employers, including agencies within the executive, judicial and legislative branches. The House Conference Report accompanying IIRIRA confirms our reading of section 412(d): "This provision clarifies that the Federal government must comply with section 274A of the Immigration and Nationality Act . . . ." H.R. Conf. Rep. No. 104–828, at 237 (1996). The plain text of the statute, together with its legislative history, thus leaves no question as to Congress's intent that federal government entities be covered by section 274A, including the investigation, assessment and enforcement provisions of section 274A(e).

Having concluded that Congress intended to authorize the INS to assess civil penalties and bring enforcement actions against other governmental employers, we further conclude that the INS can exercise that authority consistent with the Constitution. Because different constitutional issues are raised by INS enforcement of section 274A against executive agencies, the judiciary, and Congress, we will separately address application of the statute to each branch.

*Enforcement Actions Against Executive Branch Agencies*

The President has authority under Article II of the Constitution to supervise the executive branch, which includes the authority to resolve disputes within that branch. Authorizing the INS to assess civil penalties against other agencies does not give rise to a constitutional problem under Article II. The critical point is that the INA "does not preclude the President from authorizing any process he chooses to resolve disputes between [the INS] and other federal agencies regarding the assessment of administrative penalties." *Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act*, 21 Op. O.L.C. 109, 116 (1997) ("EPA Opinion"). Under section 274A, any agency that disputes an INS assessment has the opportunity to voice its objections in an administrative hearing before an ALJ, whose decision is subject to review by the Attorney General or her delegate. 8 U.S.C. § 1324a(e)(7). There is no limitation in the statute on the President's authority to review the matter if he chooses to do so, and the absence of any such restriction on his discretion is dispositive. EPA Opinion, 21 Op. O.L.C. at 116.

In the context of one federal executive agency assessing civil penalties against another, the statutory provision of judicial procedures to enforce those penalties also might be thought to raise constitutional concerns related to the Article III limitation on the jurisdiction of the federal courts to actual cases and controversies.

The civil action provisions contained in sections 274A(e)(8) and (9) might be construed to suggest that one executive branch agency may sue another in federal court over an administrative penalty. This Office has consistently held that " 'lawsuits between two federal agencies are not generally justiciable.' " EPA Opinion, 21 Op. O.L.C. at 111 (quoting *Constitutionality of Nuclear Regulatory Commission's Imposition of Civil Penalties on the Air Force*, 13 Op. O.L.C. 131, 138 (1989)). Federal courts may adjudicate only actual cases and controversies, and a lawsuit involving the same party as both plaintiff and defendant — which would generally be the result if one executive agency sued another — does not constitute an actual controversy.

However, in practice, such a scenario would not arise, for the internal executive branch dispute-resolution process described above would either obviate the need for a final administrative order or preclude noncompliance with such an order. In the event of any dispute between INS and another executive agency as to a civil penalty assessment, the President, as head of the executive branch, has the authority either to direct the Attorney General not to impose a final order or to order the agency to comply with such an order. In either case, the judicial review provisions of sections 274A(e)(8) and (9) simply would not be triggered.[2]

*Enforcement Actions Against the Judiciary*

As noted above, the definition of "person or other entity" applies to the judicial branch, as well as to the legislative and executive branches. Application of section 274A to the judiciary raises questions concerning the possible assertion of judicial immunity.

We do not believe that any plausible claim of judicial immunity from section 274A could be made in the wake of *Forrester v. White*, 484 U.S. 219 (1988). In *Forrester*, the Supreme Court concluded that questions regarding the scope of absolute judicial immunity must be evaluated in light of the purposes served by such immunity. *Id.* at 226–27. That "functional approach" looks at the nature of the official functions exercised and evaluates "the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Id.* at 224. The Court in *Forrester* applied the functional approach to reject a judge's claim of absolute immunity from civil liability for his decision to demote and discharge a probation officer. In doing so, the Court distinguished between "judicial acts" and "the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.* at 227. It reasoned that, with respect to the latter category, the danger of "officials' being deflected from the effective performance of their duties" was not substantial enough to warrant absolute immunity. *Id.* at 230. The Court held that administra-

---

[2] Indeed, the Executive Branch has various procedures in place to avoid litigation and promote internal dispute resolution *See, e g*, Exec. Order No 12146, 3 C.F R. 409 (1979)

tive decisions, including personnel decisions, are not regarded as judicial acts and thus are not immunized "even though they may be essential to the very functioning of the courts." *Id.* at 228.

*Forrester*'s holding makes clear that personnel decisions such as those that are the subject of section 274A enforcement actions do not warrant absolute judicial immunity. Such actions fall into the category of "administrative, legislative, or executive functions" that a judge might perform, rather than "judicial acts" that merit the protection offered by absolute immunity.

Nor do we see any separation of powers problem with executive enforcement of section 274A against the judiciary. The Supreme Court has made clear that not all interactions between the judiciary and the executive branches, even those that might be categorized as "quite burdensome," are necessarily constitutionally forbidden. *Clinton v. Jones*, 520 U.S. 681, 702 (1997). It is only where the burden imposed by one branch is so onerous as to "impair another in the performance of its constitutional duties" that the general separation of powers principle is violated. *Id.* at 701 (citing *Loving v. United States*, 517 U.S. 748 (1996)). Although an enforcement action under section 274A would impose some administrative burdens upon its subject — to the extent, for example, that it required compliance with subpoenas issued or cooperation with investigative efforts — such burdens would certainly not be so demanding as to interfere with the judiciary's proper execution of its constitutional obligations. *See Mistretta v. United States*, 488 U.S. 361, 409 (1989) (President's appointment and removal power over federal Sentencing Commission does not "prevent[ ], even potentially, the Judicial Branch from performing its constitutionally assigned functions").

Indeed, in the context of criminal law enforcement, courts have consistently upheld the power of the executive branch to prosecute sitting judges, notwithstanding the more significant intrusion upon the judiciary occasioned by such enforcement, and have rejected the judges' claims that such executive action undermines judicial autonomy. *See, e.g., United States v. Claiborne*, 727 F.2d 842, 845–49 (9th Cir. 1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982); *United States v. Isaacs*, 493 F.2d 1124, 1142–44 (7th Cir.), *cert. denied*, 417 U.S. 976 (1974). As the court in *Hastings* explained in rejecting a rule that would have granted sitting federal judges immunity from criminal prosecution: "[T]he minuscule increment in judicial independence that might be derived from the proposed rule would be outweighed by the tremendous harm that the rule would cause to another treasured value of our constitutional system: no man in this country is so high that he is above the law." 681 F.2d at 711. If executive enforcement of the criminal laws against the judiciary (which could include indictment, prosecution, and imprisonment of a sitting judge) does not undermine judicial independence, we cannot say that the comparatively negligible intrusion upon the judiciary that might be occasioned by executive enforcement of section 274A is a threat to judicial autonomy.

*Enforcement Actions Against Congress*

For similar reasons, we see no general separation of powers problem with applying section 274A against Congress. The more significant question is whether enforcement actions may be initiated against Members of Congress or congressional offices consistent with the legislative immunity accorded by the Speech or Debate Clause of the Constitution.[3] The Speech or Debate Clause provides that, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1.

In interpreting the Speech or Debate Clause, the Supreme Court has not confined its protections literally to "Speech or Debate in either House" but has given it "a practical rather than a strictly literal reading which would limit the protection to utterances made within the four walls of either Chamber." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979). Thus, in *United States v. Johnson*, 383 U.S. 169 (1966), the Court foreclosed prosecution of a Member of the House of Representatives for allegedly taking a bribe in return for delivering a speech on the floor of the House. The indictment necessarily focused upon both Johnson's motives in making the speech and the contents of the speech itself, and the Court concluded that the Congressman's motive "is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry." *Id.* at 180. In holding Johnson immune from prosecution under the Speech or Debate Clause, however, the Court emphasized that its holding was limited to the facts before it, and reserved the question whether Speech or Debate immunity would preclude "a prosecution which, though as here founded on a criminal statute of general application, does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." *Id.* at 185.

Six years later, in *United States v. Brewster*, 408 U.S. 501 (1972), the Supreme Court resolved that question by holding that Speech or Debate immunity did not bar prosecution of a member of Congress for soliciting and receiving sums of money in return for "official acts performed by him in respect to his action, vote and decision" on proposed postal rate legislation, where the Member could successfully be prosecuted without inquiry into either legislative acts or their motivation:

> The question is whether it is necessary to inquire into how
> appellee spoke, how he debated, how he voted, or anything he did
> in the chamber or in committee in order to make out a violation

---

[3] With respect to the applicability of section 274A against Congress, we will here address only the general question of the availability of speech and debate immunity We do not address the more specific question of who the proper defendant may be in individual enforcement actions. We also do not address the question whether the constitutional privilege against arrest except in cases of "Treason, Felony and Breach of the Peace" that is accorded Members during sessions of Congress would preclude enforcing a subpoena in an administrative proceeding against a Member while Congress is in session U S Const art I, § 6, cl. 1. *See Gravel v. United States*, 408 U S. 606, 614–15 (1972).

of this statute. The illegal conduct is taking or agreeing to take money for a promise to act in a certain way. There is no need for the Government to show that appellee fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise.

Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act. . . . Nor is inquiry into a legislative act or the motivation for a legislative act necessary to a prosecution under this statute or this indictment.

*Id.* at 526.

Accordingly, the Court in *Brewster* confirmed that the Clause does not protect all conduct relating in any way to the legislative process, but is "limited to an act which was clearly a part of the legislative process — the *due* functioning of the process." *Id.* at 515–16 (emphasis in original). Proper attention to the history and purposes of the Clause, including the underlying separation of powers concerns, did not justify a broader reading:

We would not think it sound or wise, simply out of an abundance of caution to doubly insure legislative independence, to extend the privilege beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process. Given such a sweeping reading, we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to "relate" to the legislative process.

*Id.* at 516.

The Court further clarified the proper scope of the Speech or Debate Clause in *Gravel v. United States*, 408 U.S. 606 (1972), decided the same day as *Brewster*. Senator Gravel made copies of the Pentagon Papers part of the public record of a meeting of the Senate subcommittee that he chaired. Subsequently, the press reported that Senator Gravel had separately made arrangements with a private press to publish the papers. A federal grand jury that was investigating alleged criminal conduct with respect to the public disclosure of these classified documents subpoenaed Senator Gravel's aide to testify, and Senator Gravel sought to quash the subpoena under the Speech or Debate Clause.[4] *Id.* at 608–09. The Court held that the action under scrutiny — the publication by a nongovernmental

---

[4] The Court concluded that "the Speech or Debate Clause applies not only to a Member [of Congress] but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Id* at 618

press of classified documents — was not "protected speech or debate within the meaning of Art. I, § 6, cl. 1 of the Constitution." *Id.* at 622.

The Court began its analysis by noting that simply because "Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature." *Id.* at 625. It then explained:

> The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Id.* The hearings were complete and the record of the hearings was available. Subsequent publication of the Pentagon Papers by a nonprofit press was neither requested nor authorized by the Senate and "was in no way essential to the deliberations of the Senate." *Id.* Because questioning regarding that publication did not "threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence," the Court determined that this conduct was not protected by the Speech or Debate Clause. *Id.*

Although the Supreme Court has thus delineated the general scope of Speech or Debate immunity, it has not yet resolved the question of its applicability to employment-related decisions. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court specifically reserved the question whether a Congressman's allegedly discriminatory decision to fire his administrative assistant was shielded by the clause. *Id.* at 236 n.11, 248–49. Two courts of appeals, however, have addressed this issue.

In the original panel decision in *Davis*,[5] the Fifth Circuit determined that the Speech or Debate Clause did not protect a Congressman from a suit by a former aide who alleged that the Congressman unconstitutionally discriminated against her on the basis of her sex when he dismissed her. 544 F.2d 865, 878 (5th Cir. 1977), *rev'd on other grounds*, 571 F.2d 793 (1978) *(en banc)*, *rev'd*, 442 U.S. 228 (1979). The Senator had written the aide a letter commending her job performance, but concluding that it was "essential that the understudy to [his] Administra-

---

[5] The original panel decision in *Davis* was the only decision in the history of that case to address the Speech or Debate Clause issue. The Fifth Circuit, in its *en banc* opinion, did not reach the Speech or Debate Clause question because it concluded that the plaintiff could not maintain a private cause of action under the due process clause of the Fifth Amendment. *Davis v Passman*, 571 F.2d 793, 801 (5th Cir 1978). The Supreme Court reversed on that question, holding that both a cause of action and a damages remedy could be implied under the Fifth Amendment, however, because the *en banc* Court of Appeals had not considered the Speech or Debate Clause issue, the Supreme Court also declined to reach it *Davis*, 442 U.S at 236 n 11, 248–49

tive Assistant be a man.'' *Id.* at 867 n.1. Reciting familiar passages from *Gravel* that limit the scope of the clause to ''legislative acts,'' the panel concluded:

> [R]epresentatives are not immune from inquiry into their decisions to dismiss staff members. Such dismissal decisions certainly are not ''an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings . . . .'' [quoting *Gravel*, 408 U.S. at 625]. Peripheral or tangential activities of a representative must not be confused with the legislative core. . . . When members of Congress dismiss employees they are neither legislating nor formulating legislation. The fear of judicial inquiry into dismissal decisions cannot possibly affect a legislator's decisions on matters pending before Congress. The democratic process remains unfettered.

*Id.* at 880. Its holding, the panel believed, ''g[a]ve effect to the Supreme Court's mandate in *Gravel*: 'Legislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons.' '' *Id.* at 881 (quoting *Gravel*, 408 U.S. at 615). Because exceptions to the constitutional premise that all persons are equal before the law ''must be limited, guarded, and sparingly employed,'' the court insisted that ''Davis is entitled to have her claim heard on the merits.'' *Id.*

The Court of Appeals for the District of Columbia Circuit concluded almost a decade later, however, that legislative immunity did shield a Congressman from a suit challenging an employment decision. *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923 (D.C. Cir.), *cert. denied*, 479 U.S. 996 (1986). In *Browning*, a black woman who was discharged from her job as Official Reporter of the House of Representatives claimed that her dismissal was racially motivated, in violation of the Fifth Amendment. 789 F.2d at 924–25. The court, relying on *Gravel*, asserted that:

> Personnel decisions are an integral part of the legislative process to the same extent that the affected employee's duties are an integral part of the legislative process. . . . Thus, if the employee's duties are an integral part of the legislative process, such that they are directly assisting members of Congress in the ''discharge of their functions,'' personnel decisions affecting them are correspondingly legislative and shielded from judicial scrutiny.

*Id.* at 928–29 (citation omitted). Applying this standard, the court discussed at length the importance of the role of an Official Reporter in the communicative and deliberative processes of Congress, and concluded that such reporting was

indeed an integral part of legislative functioning. *Id*. at 929–30. In coming to this conclusion, the court pointed out that, in order to resolve Browning's claims, the judiciary

> would necessarily have to inquire about matters at the very heart of the legislative process, such as the nature of the hearings to which Browning was assigned, the purposes underlying those hearings, and whether Browning's performance frustrated those purposes.

*Id*. at 930.

There are two ways to read the decision in *Browning*. First, *Browning* could be read for the proposition that, in determining whether Speech or Debate immunity attaches to any particular employment decision, the proper focus is whether judicial scrutiny of that decision would necessitate any inquiry into legislative conduct or motivations. If so, then the employment decision relates sufficiently to the legislative process to merit immunity. *See id.; see also* House of Representatives' Brief in Opposition to Petition for Certiorari, *Browning v. Clerk, House of Representatives* (No. 86–547), at 5. Alternatively, *Browning* could be read more broadly, to suggest that the applicability of Speech or Debate immunity in the employment context depends solely upon the nature of the employment at issue. If the employee's duties can be said to be an "integral part of the legislative process," immunity attaches to any personnel decisions regarding that employee; if the employee's duties cannot be so characterized, it does not. *Browning*, 789 F.2d at 929.

While we acknowledge that there is language in *Browning* to support the second reading that focuses on employment duties, Supreme Court Speech and Debate precedents, as well as the specific facts of *Browning*, compel our conclusion that the decision must be read more narrowly.[6] Under *Gravel* and *Brewster*, the mere

---

[6] We note too that there is some question whether and how the Supreme Court's ruling in *Forrester v. White* bears on *Browning* As noted above, *Forrester* requires a "functional" approach to claims of absolute judicial immunity in the context of employment decisions. The distinction that *Forrester* makes between "judicial acts" and "the administrative, legislative, or executive functions that judges may occasionally be assigned by law to perform" is based on the rationale that, with respect to the latter category, the danger of "officials' being deflected from the effective performance of their duties" is not substantial enough to warrant absolute immunity *Forrester*, 484 U S. at 230. That rationale could be applied equally to the administrative functions of the legislative branch, such as hiring of personnel, and verification that they are not unauthorized aliens.

In the wake of *Forrester*, the District of Columbia Circuit, in *Gross v Winter*, 876 F 2d 165 (D C. Cir. 1989), applied *Forrester*'s functional approach in rejecting a D C. Council member's claim of legislative immunity for her allegedly discriminatory decision to fire a probation officer *Gross* recognized that "[t]he Supreme Court's strict 'functional' immunity analysis in *Forrester* . contrasts with the employee-centric approach this court took in *Browning*." *Id* at 171 The court found *Forrester*, not *Browning*, controlling·

> The functions of probation officers and legislative aides are therefore equally important to the due functioning of the judicial and legislative processes, respectively Nonetheless, under *Forrester*, the functions judges and legislators exercise in making personnel decisions affecting such employees are administrative, not judicial or legislative. *Forrester*'s functional approach also forecloses the somewhat curious logic that the greater the employee's importance to the legislative process the greater should be the state legislator's freedom to violate that employee's constitutional rights

fact that an individual may have some duties that relate to core legislative processes does not make all matters bearing on that person's employment "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. As the Court noted in *Brewster*, in a passage relied upon in *Browning*: "The only reasonable reading of the Clause, consistent with its history and purpose, is that it does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Id.* at 528, *quoted in* 789 F.2d at 927. Under that standard, even if a particular employee's duties could be said to relate to the legislative process, there might be any number of purely administrative decisions made with respect to that employee that would have nothing to do with the employee's fulfillment of his or her duties and that therefore would not merit legislative immunity.[7]

The Speech or Debate Clause arguably was implicated in *Browning* not because the job of official reporter for the House of Representatives included duties that were integral to the legislative process, 789 F.2d at 928, but because the disputed factual issue in the employment claim was whether the reporter was fired for poor job performance or for racial reasons. *Id.* at 930. We believe that the more sweeping language in *Browning* must be read in light of those facts. The District of Columbia Circuit court concluded that the particular employment decision at issue in *Browning* presented a risk of judicial second-guessing of judgments "at the very heart of the legislative process." *Id.* at 930. Legislative immunity was warranted in *Browning*, on the narrower view, because assessing the adequacy of Browning's job performance would have required the trial court to "inquire into matters at the very heart of the legislative process" — such as the nature and purpose of the hearings to which Browning had been assigned. *Id.*

In contrast, permitting the INS to enforce section 274A against Congress would not, thwart any of the purposes underlying the Speech or Debate Clause, for

---

*Id* at 172 However, in applying *Forrester* to a case involving a D.C. Council member rather than a Member of Congress, the court in *Gross* expressly noted that it was not reaching the question "whether special considerations applicable to members of Congress, such as separation-of-powers concerns, continue to justify the absolute immunity standard for congressional personnel decisions adopted in *Browning*." *Id* More recently, in *United States v. Rostenkowski*, 59 F.3d 1291, 1303 (D.C. Cir 1995), the District of Columbia Circuit again reserved the question whether *Browning* remained good law after *Forrester*, because the employees at issue lacked "even the most tangential relationship to the 'legislative process'" and employment decisions respecting them thus could not be immunized even under the broadest reading of *Browning*.

[7] The broader reading of *Browning* is out of step not only with the Supreme Court's precedents, but also with the District of Columbia Circuit's own prior law. The *Browning* court appeared to misread an earlier decision, *Walker v. Jones*, 733 F.2d 923 (D.C Cir 1984), in which the court denied Speech or Debate Clause immunity to congressional defendants who dismissed a food service manager for allegedly discriminatory reasons *Id* at 931. *Browning* cited *Walker* as the genesis of a standard focusing on the nature of the employee's duties, and immunizing all personnel decisions with respect to employees whose duties closely relate to the legislative process *Id* at 925. In fact, *Walker* — like *Johnson, Brewster*, and *Gravel* — properly focused directly on the legislator's actions, and considered the employee's duties only as potentially relevant to the question whether a personnel action regarding that employee might implicate the legislator's motives *Id*

executive enforcement would not involve inquiry into legislative acts or the motives for legislative acts. Nor would it "threaten the integrity or independence of [Congress] by impermissibly exposing its deliberations to executive influence." *Gravel*, 408 U.S. at 625. Section 274A applies to the "hiring, recruiting, or referring" of individuals for employment in the United States, and requires employers to verify, by examining certain specified documents, that individuals being considered for employment are not unauthorized aliens. 8 U.S.C. § 1324a(b), (b)(1). Once the employer has examined these documents, the employer must attest in writing to the verification and must retain the verification form for future inspection. *Id.* § 1324a(b)(1)(A), (b)(3). Any investigation by the INS as to whether an employer has complied with these verification requirements or whether the employer knowingly hired or continued to employ an unlawful alien thus would not involve inquiry into the employee's duties or job performance. Rather, such an investigation would require examination of the verification form, and possibly the circumstances surrounding the employer's execution of that form, including whether the employer had complied in good faith with the attestation and document retention requirements. Regardless of how integrally connected to the legislative process the employee's duties might be, the actions of a Member of Congress, in complying with these verification requirements or in knowingly hiring an unlawful alien, could not be characterized as "legislative acts," and any inquiry into section 274A compliance would not reach such legislative acts or the motives underlying them. The ministerial requirements imposed under section 274A are at most "casually or incidentally related to legislative affairs." *Brewster*, 408 U.S. at 528. Like the conduct at issue in *Brewster*, knowingly hiring an unlawful alien "is, obviously, no part of the legislative process or function; it is not a legislative act." *Id.* at 526. We therefore conclude that executive enforcement of section 274A against legislative branch entities is not precluded by the Speech or Debate Clause.

## CONCLUSION

The plain language of section 274A makes clear that its enforcement provisions apply to persons and entities within all three branches of the federal government. We conclude that the INS can exercise its enforcement authority under section 274A against persons and entities within the executive, judicial, and legislative branches in a manner consistent with the Constitution.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*